The PARENTS' ASSOCIATION OF P.S. 16, et al., Plaintiffs-Appellants,

v.

Nathan QUINONES, individually and as Chancellor of the City School District of the City of New York, et al., Defendants-Appellees.

No. 367, Docket 86–7791.

United States Court of Appeals, Second Circuit.

Argued Oct. 1, 1986.

Decided Oct. 3, 1986.

---

Richard Rivera, New York City (Linda Flores, Puerto Rican Legal Defense & Educ. Fund, Inc., New York City, Martin S. Needelman, Richard J. Wagner, Brooklyn Legal Services Corp. A, Brooklyn, N.Y., on the brief), for plaintiffs-appellants.

Marilyn Richter, New York City, (Leonard Koerner, David Bloomfield, Frederick A.O. Schwarz, Jr., New York City, on the brief), for defendants-appellees.

Medgar Evers College Center for Law & Social Justice, Brooklyn, N.Y. (Esmeralda Simmons, Wendy R. Brown, Jeanne M. Woods, Brooklyn, N.Y., of counsel), filed a brief as amicus curiae on behalf of plaintiffs-appellants.

Stanley Geller, New York City, filed a brief for N.Y. Committee for Public Educ. and Religious Liberty as amicus curiae on behalf of plaintiffs-appellants.

Dennis Rapps, New York City, filed a brief for Agudath Harabanim of the U.S. and Canada, et al., as amici curiae on behalf of defendants-appellees.

Before KAUFMAN, KEARSE and ALTIMARI, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiffs The Parents' Association of P.S. 16, et al. ("Parents"), appeal from an order of the United States District Court for the Eastern District of New York, Mark A. Costantino, *Judge*, denying their motion for a preliminary injunction against the implementation by defendants Nathan Quinones, Chancellor of the City School District of the City of New York, *et al.* (the "City"), of a federally funded remedial education program at Public School 16 in Brooklyn, New York ("P.S. 16"), for parochial school students from the Beth Rachel Satmar Hasidic School ("Beth Rachel"). Parents contended that the program planned by the City would violate their rights under, *inter alia*, the Establishment Clause of the First Amendment to the Constitution of the United States, as applied to the states through the Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment. The district court denied Parents' motion, finding that plaintiffs had not established any violation of their constitutional rights or any irreparable injury. On appeal, Parents contend that the district court applied erroneous legal principles and erred in denying their motion without an evidentiary hearing. We find merit in these contentions and we therefore reverse the order denying Parents' motion for a preliminary injunction and remand for entry of an injunction against implementation of the proposed program pending the adjudication of the merits of Parents' claims.[1]

## I. BACKGROUND

P.S. 16 is a public school located in the Williamsburg section of Brooklyn, providing elementary level education for boys and girls. The great majority of the students attending P.S. 16 are Hispanics. Beth Rachel, located some four blocks away, is a private elementary school affiliated with the Satmar Hasidic Jewish sect; all of its students are girls of the Hasidic Jewish faith. Both P.S. 16 and Beth Rachel are located within Community School District 14 ("District 14").

Chapter 1 of the Education Consolidation and Improvement Act of 1981 ("Chapter

---

1. Because the proposed program was scheduled to be implemented just days after the date of oral argument of this appeal, we issued a summary order of reversal shortly after oral argument, indicating that this opinion would follow.

1"), 20 U.S.C. § 3801 *et seq.*, which superseded Title I of the Elementary and Secondary Education Act of 1965, established a federally funded program to provide remedial instruction and related support services to elementary and secondary school children who are "educationally deprived" and who live in an area—such as Williamsburg—having a high concentration of low income families. The purpose of the program is to meet the remedial educational needs of these students that cannot otherwise be met by the schools they attend. States receiving Chapter 1 funding are required to provide such remedial services to private as well as public school students. 20 U.S.C. § 3806(a). Prior to 1986, the City provided such remedial instruction and services to children attending private schools, including parochial schools such as Beth Rachel, by sending public school teachers into the private schools to conduct classes.

In 1985, the United States Supreme Court in *Aguilar v. Felton,* — U.S. —, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985) ("*Aguilar*"), upholding the decision of this Court in *Felton v. Secretary, United States Department of Education,* 739 F.2d 48 (2d Cir.1984) ("*Felton*"), ruled that " 'the use of federal funds to send public school teachers and other professionals into religious schools to carry on instruction, remedial or otherwise, or to provide clinical and guidance services' " violated the Establishment Clause of the First Amendment. *Aguilar,* 105 S.Ct. at 3236 (quoting *Felton,* 739 F.2d at 50). In an effort to comply with the restrictions imposed in *Aguilar,* the City adopted a plan to conduct remedial education classes for the Beth Rachel students on the premises of P.S. 16.

### A. *Hasidic Constraints and the City's Plan*

In general, the Hasidic faith stresses a strict separation between the Hasidim and the rest of society. Many of the Satmar Hasidim speak Yiddish in their homes, and Yiddish is the principal language of many of the Beth Rachel students. As part of their Orthodox Jewish beliefs, the Hasidim require the separation of males and females for virtually every activity, including schooling.

In an effort to induce Beth Rachel administrators to send their students to P.S. 16 for remedial education classes, the City adopted the plan here challenged (the "Plan"). A group of nine classrooms in the northwest wing of P.S. 16 was dedicated to the use of the Beth Rachel students. That section of the school was closed off from the rest of the school—used by the public school students—by the construction of swinging doors and supporting walls in a previously open corridor. Beth Rachel students were assured that their Chapter 1 classes would be conducted separately from any such classes for the public school students. Public school teachers would be provided; all would be women and all would be Yiddish-speaking. English would be taught as a second language ("ESL"), with resort to Yiddish to facilitate the Beth Rachel students' understanding. A reading method known as "Distar," previously tried and rejected by District 14 for its public school students, would be used for the Beth Rachel students since that method is used in their regular parochial school classes.[2]

According to affidavits and exhibits submitted by Parents, the City stated both to them and to the news media that the Plan was designed having in mind the "differences in religion and culture between the Hasidics and the rest of the children" (Affidavit of plaintiff Nelida Morales, dated August 28, 1986, ¶ 25) ("First Morales Affidavit"), and that without these features, the Beth Rachel students would refuse to attend remedial classes in P.S. 16 for religious reasons.

---

2. Originally, in order to provide space for the Beth Rachel classes, the Plan also required the transfer from P.S. 16 to other public schools of 69 handicapped children who had attended P.S. 16 in the 1985–1986 school year. Several of the plaintiffs received notices that their children were to be transferred. Following the commencement of the present lawsuit, this facet of the Plan was abandoned.

Parents commenced the present suit, challenging principally the segregation of the Beth Rachel students from the P.S. 16 students. They took the position that they had no objection to having the remedial classes at P.S. 16 include both public school and Beth Rachel students, but that the provision of Yiddish-speaking teachers, the teaching of English as a second language for Beth Rachel students while ESL is not available to P.S. 16's Hispanic students, and the enforced physical separation of the two groups gave at least the appearance that the City was endorsing the tenets of the Hasidic religious sect. In support of their position, Parents submitted numerous news articles reporting the views of the respective parties. A *Newsday* article of September 11, 1986, for example, reported the Hasidic view as follows:

"We struggle very hard to maintain our belief and our culture," said Rabbi Ehren Reich of the Beth Jacob Yeshiva in Borough Park, Brooklyn. "We want our children separate."

"It's not that these Hispanic people are bad, it's that they're different," said Miriam Weissman, whose daughter attends [Beth Rachel]. "They are not a good influence on our girls."

Jacob Unger, a Hasidic Jew, spent the better part of yesterday watching the picket line from a stairwell across from the school.

The issue, he said, goes to the heart of the Orthodox tradition, which requires the separation of males and females for virtually every activity, including schooling, and encourages isolation from other cultures. "If we have our kids learning with them, they'll be corrupted," Unger said. "We don't hate these people, but we don't like them. We want to be separate. It's intentional."

The same article reported that City "officials have said they decided the walls would be the best way to accommodate the students at PS 16 because Hasidim require the separation of the sexes as part of their Orthodox Jewish beliefs." Parents asserted that "there is a general perception amongst non-Hasidics in the area that public officials generally have favored the politically powerful Hasidic Community in housing and other government programs at the expense of everyone else." (First Morales Affidavit, ¶ 35.)

Thus, arguing that the City's Plan "suggests the cruel and false idea that our children are inferior and/or dangerous to the Hasidic children who the District plans to send to P.S. 16" (*id.* ¶ 6), and that it is their "children's sense that the walls are there to keep them out and that there are people who consider them undesirable" (Affidavit of plaintiff Nelida Morales, dated September 11, 1986, ¶ 15), Parents contended that the Plan invidiously discriminated against the public school students and so involved the City with the Hasidic religious sect as to constitute an establishment of religion in contravention of the First Amendment. Parents moved for a preliminary injunction against implementation of the Plan.

In opposition to the motion, the City argued that its Plan was not intended to discriminate on a racial or religious basis and that maintaining separate Chapter 1 programs for all public and parochial school students is necessary in order to encourage parochial school parents and administrators to send their children to remedial classes in the public schools. The City stated that if it were to merge the Beth Rachel and P.S. 16 classes, the Beth Rachel students would refuse to attend "under the precepts of their religion," and that the need for separate programs at P.S. 16 was "reinforce[d]" by "the Beth Rachel students' religious convictions." (Affidavit of Robert J. Radday, Director of Reimbursable Programs for Community School District No. 14, in Opposition to Preliminary Injunction, dated September 1986, ¶¶ 24, 19).

B. *The Decision of the District Court*

The district court denied Parents' motion without holding an evidentiary hearing on the merits of plaintiffs' contentions, ruling that the Plan did not violate plaintiffs' rights under the First or the Fourteenth

Amendment and caused plaintiffs no irreparable injury. Relying principally on *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), for the general proposition that provision of remedial services "at a neutral site off the premises of the nonpublic schools will not have the impermissible effect of advancing religion," *id.* at 248, 97 S.Ct. at 2605, the court rejected Parents' contention that the Plan had the primary effect of promoting the religious beliefs of the Hasidic sect, stating as follows:

> The court does not find any promotion of religion by the mere allocation of public classrooms for the Hassidic children. The court does not discern any unique alliance between the defendants and the Beth Rachel School based upon the installation of double doors. The defendants could also have placed the Hassidic children in a public library, in a mobil[e] unit or other neutral site without "promoting religion." The court also does not find an impermissible "religious enclave."

Memorandum of Decision and Order, dated September 15, 1986 ("Decision"), at 8. The court viewed Parents as "asking the court in effect to force the Hassidic children to give up a sincere religious belief and attend school in a co-educational environment," *id.* at 10, and concluded that "[t]he placement of students at P.S. 16 is an accommodation and not a symbolic union between church and state," *id.* at 9, and that "the Constitution ... affirmatively *mandates accommodation*," *id.* at 10 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 673, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984)) (emphasis in Decision).

Accordingly, the court denied preliminary injunctive relief. This expedited appeal followed.

## II. DISCUSSION

On appeal, Parents contend principally that the City's Plan (1) has the primary effect of promoting religion and (2) excessively entangles the state in religious matters, and that the district court therefore erred in denying them a preliminary injunction. The City argues that the injunction was properly denied because the Plan does not have these effects and is no more than a reasonable effort to encourage the Hasidim to send their children to the remedial classes conducted in public school.

A district court's decision to deny a preliminary injunction may not be overturned on appeal absent an abuse of discretion. *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 315 (2d Cir.1982); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975) (granting of preliminary injunction also subject to abuse-of-discretion standard of review). Such an abuse may be found if the district court applied incorrect legal standards or if it relied on findings of fact that are clearly erroneous. *E.g., Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d at 315. In the present case, we conclude that the denial of Parents' motion was an abuse of discretion because the court did not apply pertinent First Amendment standards.

The Establishment Clause of the First Amendment, which is applicable to the states through the Fourteenth Amendment, *see McCollum v. Board of Education*, 333 U.S. 203, 210–11, 68 S.Ct. 461, 464–65, 92 L.Ed. 649 (1948), provides that "Congress shall make no law respecting an establishment of religion." In interpreting this Clause, described by the Supreme Court as "opaque," *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), and as drawing a line between church and state that is "blurred, indistinct and variable ... depending on all the circumstances," *id.* at 614, 91 S.Ct. at 2112, the Supreme Court has developed three tests for determining whether a given state law is one "respecting an establishment of religion." Failure to meet any of the three conditions ordinarily means that the state program transgresses the Establishment Clause:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that nei-

ther advances nor inhibits religion, *Board of Education v. Allen,* 392 U.S. 236, 243 [88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060] (1968); finally, the statute must not foster "an excessive government entanglement with religion." *Walz [v. Tax Commission,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970)].

*Lemon v. Kurtzman,* 403 U.S. at 612–13, 91 S.Ct. at 2111; *see School District of Abington Township v. Schempp,* 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963) (*"Abington"*) ("[T]o withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."). The *Lemon* test has been thought particularly applicable to cases involving the education of children. *See Grand Rapids School District v. Ball,* — U.S. —, 105 S.Ct. 3216, 3222–23, 83 L.Ed.2d 267 (1985) (*"Grand Rapids"*).

In school cases, the first consideration set forth in *Lemon,* the validity of the state's purpose, is rarely at issue. The state plainly has a secular interest in ensuring the education of schoolchildren, and Parents in the present case do not assert that the City lacks the requisite purpose. The controversy centers rather on whether the City's Plan has the primary effect of advancing the religious tenets of the Hasidic sect and whether it fosters an excessive entanglement of the City with religion. Our discussion below focuses principally on the "primary effect" test.

■ The Establishment Clause not only forbids the creation of a state religion, but requires as well that government remain neutral with respect to all religions. *Abington,* 374 U.S. at 215–16, 83 S.Ct. at 1567–68. The rationale behind the requirement of neutrality is, in part, that governmental actions giving even the appearance of favoring one religion over another are likely to cause divisiveness and disrespect for government by those who hold contrary beliefs:

> The wholesome "neutrality" of which this Court's cases speak thus stems from a recognition of the teachings of history

that powerful sects or groups might bring about a fusion of governmental and religious functions or a concert or dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies. This the Establishment Clause prohibits.

*Abington,* 374 U.S. at 222, 83 S.Ct. at 1571. Similarly, in *Grand Rapids,* the Court stated that

> even such a praiseworthy, secular purpose [as education of schoolchildren] cannot validate government aid to parochial schools when the aid has the effect of promoting a single religion or religion generally or when the aid unduly entangles the government in matters religious. For just as religion throughout history has provided spiritual comfort, guidance, and inspiration to many, it can also serve powerfully to divide societies and to exclude those whose beliefs are not in accord with particular religions or sects that have from time to time achieved dominance.

105 S.Ct. at 3222.

The concern for neutrality is nowhere more important than in education programs, for "[t]he government's activities in this area can have a magnified impact on impressionable young minds," *id.* at 3222, "provid[ing] a crucial symbolic link between government and religion, thereby enlisting—at least in the eyes of impressionable youngsters—the powers of government to the support of the religious denomination," *id.* at 3223–24. "'The symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as of free and voluntary choice." *Id.* at 3226. Thus, the Court has recognized in the context of state provision of teachers for remedial classes in parochial schools, that

> [g]overnment promotes religion as effectively when it fosters a close identification of its powers and responsibilities

with those of any—or all—religious denominations as when it attempts to inculcate specific religious doctrines. If this identification conveys a message of government endorsement or disapproval of religion, a core purpose of the Establishment Clause is violated....

It follows that an important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.

*Id.* at 3226.

These principles were apparently ignored by the district court, which did not cite *Grand Rapids* or any of the concerns there addressed. Yet the City's Plan seems plainly to create a symbolic link between the state and the Hasidic sect that is likely to have a magnified negative impact on the minds of the youngsters attending P.S. 16. Thus, each day, the public school students would observe some 390 Beth Rachel students arrive at P.S. 16. The Beth Rachel students would be taught in classrooms only they may use; no public school students would be taught either in those classes or in those rooms. Yiddish would be spoken in the Beth Rachel classes. Only Hasidic girls would be taught; those girls would be allowed no contact with boys. Only female teachers would teach the Hasidic girls. And where once there was an open corridor allowing freedom to traverse the entire hall, there are now a wall and doors partitioning the Beth Rachel girls from the public school students.

In keeping with their general separatist beliefs, the Hasidim have expressed a desire to keep their children separate. As quoted in Part I.A. above, they are reported as seeing Hispanics as "different" and "not a good influence on [the Hasidic] girls," and as believing that educating Hasidic children in the company of Hispanic children would "corrupt[ ]" the Hasidic children. The lengths to which the City has gone to cater to these religious views, which are inherently divisive, are plainly likely to be perceived, by the Hasidim and others, as governmental support for the separatist tenets of the Hasidic faith. Worse still, to impressionable young minds, the City's Plan may appear to endorse not only separatism, but the derogatory rationale for separatism expressed by some of the Hasidim.

We are unpersuaded by the City's argument that the P.S. 16 Plan is validated by the fact that the City perceives a need, on a citywide basis, to conduct separate remedial classes for public and parochial school students in order to encourage the participation of the latter. The details of the City's Chapter 1 programs in other areas of the city are not in the record, and except for the representation that separate classes are conducted for public and private school students, we have no information as to the extent to which plans in different areas may vary. We note, however, that much as we have been told that separate classes are a standard feature, the City has never stated that in other areas of the city the remedial classes for the private school students are to be segregated along lines of gender of students and teachers, or that care is taken to assign only bilingual teachers to teach the parochial school students, or that partitions have been built to separate the parochial school students from the public school students. Hence, we doubt that the characteristics of the Plan that are most conducive to a perception of City endorsement of Hasidic religious tenets are common throughout the city. And were those or similarly divisive symbolic characteristics common to the citywide plan, we would hardly think the pervasiveness of the practice a basis for approving it.

Nor do we agree with the district court's view that the plaintiffs' injunction motion "ask[ed] the court in effect to force the Hassidic children to give up [their] sincere religious belief[s]." The Free Exercise Clause of the First Amendment ("Congress shall make no law ... prohibiting the free exercise [of religion]") does not prohibit a

government from forcing a choice between receipt of a public benefit and pursuit of a religious belief if it can show a compelling reason for doing so. *See Bowen v. Roy,* — U.S. —, 106 S.Ct. 2147, 2156, 90 L.Ed.2d 735 (1986). Avoiding a violation of the Establishment Clause that would otherwise result from an apparent endorsement of the tenets of a particular faith is ample reason for compelling that choice. And in the circumstances of the present case, it is difficult to believe that the City cannot devise alternatives for making its remedial services available to the Beth Rachel students in a way that neither requires them to disregard their religious beliefs nor appears to endorse those beliefs.

We conclude that Parents plainly demonstrated the likelihood that they would succeed in establishing at trial that the City's Plan failed to pass the "primary effect" test and therefore violated their rights under the Establishment Clause. Since "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976), Parents were entitled to a preliminary injunction preventing implementation of the Plan. The district court's failure to properly apply the above First Amendment principles to grant the injunction constituted an abuse of discretion.

Finally, we note that the lengths to which the City has gone to accommodate Hasidic beliefs may well lead the trial court to conclude that the Plan violates the First Amendment under the "excessive entanglement" test as well as under the "primary effect" test. This Court, however, having concluded that Parents were entitled to preliminary injunctive relief on the basis of the latter, need not decide whether they also showed a likelihood of success under the former. The issue of entanglement, along with other constitutional and statutory claims asserted by Parents, remain open for adjudication in the trial on the merits. We are confident that that trial will not be delayed.

## CONCLUSION

The order of the district court denying plaintiffs' motion for a preliminary injunction is reversed.