SOUTHSIDE FAIR HOUSING COMMIT-
TEE, Lucy Rodriquez, Miguel De Los
Santos, Israel Rosario, Conrado Diaz,
Norma Diaz Tejada, Bolivar Pascual,
Carmelo Gonzalez, Francisco Peguero,
Luz Baez, Diana Dawson, Blanca Riv-
era, Irma Montero, Charles L. Mercado,
Maritza Andujar, Reyna Gonzalez, Iris
Pena, Leroy Beckles and Gustavo
Mueses, individually and on behalf of
all others similarly situated, Plaintiffs,

v.

The CITY OF NEW YORK, New York
City Department of Housing Preserva-
tion and Development and United Tal-
mudic Academy, Torah V'Yirah, Inc.,
Brooklyn Villas, Inc. and Brooklyn Vil-
las Limited Partnership, Inc., Defen-
dants.

No. 90 C 31.

United States District Court,
E.D. New York.

Nov. 2, 1990.

Steel & Bellman, P.C. (Lewis M. Steel, Susan Ritz, of counsel), New York City, Brooklyn Legal Services Corp. "A" (Martin S. Needelman, Foster S. Maer and Mauricio Hernandez, Law Graduate, of counsel), Brooklyn, N.Y., Puerto Rican Legal Defense and Educ. Fund, Inc. (Ruben Franco, Ken Kimmerling and Richard Rivera, of counsel), New York City, for plaintiffs.

Victor A. Kovner, Corp. Counsel of the City of New York (Thomas Bergdall, Richard Klein, Asst. Corp. Counsel, and Joseph Valette, Student Legal Specialist, of counsel), New York City, for defendant City of New York.

Webster & Sheffield (Sandra E. Langs, Jeffrey S. Dantowitz and Jean M. Farrell, of counsel), New York City, for defendant United Talmudical Academy, Torah V'Yirah, Inc.

Levy, Gutman, Goldberg & Kaplan (Jeremiah S. Gutman, Gail A. Wechsler, of counsel), New York City, for amici curiae.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs brought this action for, among other things, an order (a) enjoining any further construction or planning for construction on certain land known as Site 4 in Williamsburg Urban Renewal Area I (Area I), and (b) rescinding the sale of the land by the City of New York (the City).

Plaintiffs are Southside Fair Housing Committee (the Housing Committee) and eighteen persons describing themselves as Hispanics or Latinos and African–Americans. The pertinent defendants are the City, the New York City Department of Housing Preservation and Development (the Development Department), and the United Talmudical Academy, Torah V'Yirah, Inc., the educational arm of an Hasidic congregation called Congregation Yetev Lev D'Satmar. This memorandum will refer to these two entities jointly as "the Academy."

On plaintiffs' motion for a preliminary injunction the court took evidence, and, at the request of the parties, consolidates the hearings on the motion with the trial on the merits.

### I.

Plaintiffs ask the court to prevent the Academy from further developing a synagogue, a yeshiva, and faculty housing on Site 4 sold to the Academy by the City, and to set aside the sale. Plaintiffs say that the sale violated their rights under the First and Fourteenth Amendments, and that in making it the City intended both to create an Hasidic "enclave" to the detriment of the Hispanic community and to support the Satmar Hasidic religion.

Many of the critical evidentiary facts are undisputed.

In 1967 the City, along with the federal and state governments, created Area I, consisting of about nineteen city blocks in Williamsburg, Brooklyn. The City condemned and cleared deteriorated property and provided for the development of the area under an Urban Renewal Plan (the Plan).

Before clearance both Hispanics and Jews, both Orthodox and Hasidic, lived in Area I. The residents immediately to the north of Area I were and still are largely Hispanic. Those living to the east were and are for the most part Hasidic or Orthodox Jews.

Site 4 occupies about one square block. Before 1967 it contained low-rise private housing, some commercial businesses, at least two synagogues, one run by the Academy, ritual baths, and a yeshiva. The residents were both Hispanic and Jewish, Orthodox and Hasidic.

The present population of Area I is mixed. There are four large, high-rise subsidized housing developments, each with occupants of mixed ethnic composition, Independence Towers, Taylor–Wythe Houses, Clemente Plaza, and Bedford Gardens. Two smaller units of market rate housing,

PAZ–Ross Houses and Bedford Rehabs, were purchased almost exclusively by Orthodox and Hasidic Jews. In addition, certain other parcels are under development as condominiums, known as Brooklyn Villas, by UJO, an organization with some overlap in membership with the Academy. The Brooklyn Villas matter is also a part of the case and has been tentatively settled by the parties.

The percentages of white and non-white occupancy of housing units in the subsidized housing range from 54% non-white and 46% white in Clemente Plaza to 68% white and 32% non-white in Independence Towers. In Area I whites occupy 1596 housing units and minority members 935.

To the north of Area I is another urban renewal area, Williamsburg Urban Renewal Area II (Area II), created in 1984 to rehabilitate and develop subsidized, low income housing. Area II has mainly older, low-rise apartment buildings, occupied chiefly by Hispanics.

During the 1970s the City chose urban renewal sponsors and developers on a "sole source" basis. The Development Department staff consulted with organizations and people in the local community, including members of the local Community Boards, and sought out persons established in the community who had succeeded in development projects. The tentative designation of a developer was reviewed by the local Community Board and the City Planning Commission (the Planning Commission). The final designation was made by the City Board of Estimate.

Originally the City considered Site 4, as well as other sites in Area I, for use as a park. However, by the early 1970s the Development Department started to discuss other so-called "institutional" uses for Site 4. The Academy approached the Development Department to construct on the site a nursing home, a yeshiva, and a medical facility.

In July 1977 the Development Department proposed subdividing the site into Sites 4A, 4B, and 4C and tentatively designated the Academy as the developer of the site.

In May of 1978 the Development Department submitted the Academy's proposals for Sites 4A, 4B, and 4C to the Planning Commission, and in August 1978 submitted amendments to the Urban Renewal Plan, changing the designated use of Site 4 from a park to "institutional" use. The papers supporting the change set forth the proposed uses as a yeshiva, a health related facility, and a nursing home, and the designation of the Academy as the developer.

The then recently adopted provision of the City Charter known as the Uniform Land Use Review Procedure (the Review Procedure) required the amendments to go through various reviews and hearings. The Planning Commission first had to certify a proposal. Then the local Community Board, the Planning Commission, and ultimately the Board of Estimate had to hold public hearings, review the proposal, and approve or disapprove it.

On November 20, 1978 the Planning Commission certified the amended plan and the proposed disposition and referred the matter to the Community Board. The board held a public hearing on December 19, 1978, and on January 9, 1979 recommended approval of the Plan by a vote of 35 in favor, 5 against, and approval of the dispositions of Sites 4A and 4B to the Academy by a vote of 37 in favor, none opposed, and 4 abstaining. The board tabled the vote on Site 4C pending receipt of further information from the Academy as to its plans for further development in the area. On March 13, 1979 the Community Board approved the disposition of Site 4C to the Academy by a vote of 34 in favor and none against or abstaining.

In the meantime and in February 1979 the Planning Commission had held a hearing but withheld a vote until after the Community Board had voted on Site 4C. On March 28, 1979 the Planning Commission, after receiving the Community Board approval as to Site 4C, certified an approval of the amended plan. On the same date the Planning Commission approved the dispositions to the Academy of Site 4A as a Health Related Facility, Site 4B as a Medical Building, and Site 4C as a Religious

School. On May 24, 1979 the Board of Estimate held a hearing and approved the amended plan and the dispositions.

In late 1979 the Academy asked to be allowed to build on Site 4C, a residence for the new Rebbe, the school chancellor, with space for meetings concerning congregation and school matters. The Development Department referred the matter to the Planning Commission. On December 20, 1979, Robert F. Wagner, Jr., the Chairman of the Planning Commission, advised the Development Department that the Planning Commission found the proposed change to be within the scope of the previous approval since 75 percent of the residence would be devoted to institutional purposes, and that the department could make the change administratively.

In April 1980 the Board of Estimate, after a public hearing, approved the transfer of Site 4C to the Academy, in accordance with a written contract and at the appraised value of $150,000. After receipt of the deed on October 20, 1980 the Academy constructed the Rebbe's residence and community office, completing it in 1981.

In the early 1980s the Academy had to abandon its plan for a nursing home and a health related facility because state funding was no longer available. The Academy thus requested that the Development Department change the use of Sites 4A and 4B to a school and dormitory housing and later to faculty housing.

In 1984 the Development Department proposed to amend the Plan, changing, among other things, the approved uses of Sites 4A, 4B, and 4C from the specific institutional uses to a generic institutional use and amending "institutional uses" to include "dormitory facilities affiliated with religious institutions." Theretofore "institutional uses", so far as relevant, had included only "synagogues, churches, day care centers, nursing homes, medical centers and related facilities," and "[s]chools and related facilities."

The Development Department brought this suggested amendment before the Community Board at a public hearing on February 28, 1984. Over five hundred people attended including Carmen Calderon, who later became one of the three leaders of plaintiff Housing Committee.

At the hearing Herbert Siegel, Director of Planning in the Development Department, explained that the City was going to do "something innovative in order to bring together two communities [Hispanic and Hasidic] that had previously had disputes." He said that the City was going to commit the funds realized from its sale of parcels in Areas I and II to assist in developing projects to benefit low and moderate income families. This was referred to as a cross subsidy, originally proposed by Commissioner Anthony Gliedman of the Development Department because of the then lack of federal and state funds for housing.

At the Community Board meeting every site in Areas I and II was discussed, including the proposed use of Site 4. The Academy's use of Site 4A for a yeshiva and Site 4B for faculty housing was thus brought before the Community Board.

At the four hour meeting Siegel made the initial presentation and numerous others spoke. Siegel did not recall many speaking in opposition to the Academy's plans for Site 4. Most of the discussion concerned the relocation of thirty families displaced in Area II. The Community Board minutes of the hearing show that Ms. Calderon was aware that Sites 4A and 4B were to be sold to the Academy. She suggested that "all sales monies" including those from "institutional Site 4 should go into cross subsidy."

The amended plan was approved by the Community Board. A representative of the Community Board spoke at the Planning Commission's public hearing and urged approval. A spokesman for Epiphany Church, a largely Hispanic church, also voiced support for the plan and its speedy implementation, presenting a petition containing 1100 signatures. The Planning Commission gave its approval on April 9, 1984. After a public hearing on May 24, 1984, the Board of Estimate approved. This was all in accordance with the requisite Review Procedure. No one appeared in opposition at either hearing.

The final disposition of Sites 4A and 4B took place in 1988. On February 1, 1988 the property was appraised at a fair market value of $680,000. On July 14, 1988 the Board of Estimate, after public notice and hearing, approved the contract of sale between the City and the Academy at that appraised price, and authorized the Mayor or Deputy Mayor to execute the requisite deed.

The day before the Board of Estimate hearing of July 14, 1988 a Community Board Vice Chairman asked that the matter be laid over until the August 11, 1988 meeting of the Board of Estimate. The Borough President's office pointed out that this would impose substantial penalties on the purchaser because, among other things, a complete reappraisal would be required. The Board of Estimate therefore agreed to approve the sale provided the Development Department submitted the matter to the Community Board for comments and a recommendation before title passed.

At the July 14, 1988 hearing a representative of the Development Department publicly agreed to submit the proposed sale to the Community Board. The Review Procedure Committee of that board then put the matter on its calendar for July 25, 1988, sending meeting notices to the members of the Executive and Housing Committees of the Community Board and to the tenant associations of Independence Towers, Taylor–Wythe Houses, Clemente Plaza, and Bedford Gardens.

About thirty people attended the July 25, 1988 meeting. The proposal was discussed in great detail with the representatives of the City. The consensus of those attending was that it merited approval.

The Committee's written report gave among the reasons for its support that (1) all three proposed uses, a 6,000 seat synagogue, a school, and faculty housing, would serve "clearly understood institutional purposes reflected in the urban renewal plan," (2) the $680,000 purchase price, "which will be added to the cross-subsidy fund," was not unreasonable, (3) the construction of the facilities would not unduly disrupt or undermine the integrity of the surrounding community because the synagogue would rise only 70 feet above street level, and because there would thus be no substantial increase in traffic since the religious doctrine of those attending the synagogue on the Sabbath required them to come on foot, and (4) the housing would be restricted to faculty.

The Committee concluded that the sale was consistent with the urban renewal plan, would "provide badly needed additional monies into the cross-subsidy fund," and would "not negatively impact the surrounding community."

On August 10, 1988 the Chairman of the Community Board and the Chairman of the Review Procedure Committee jointly wrote a letter to the Mayor enclosing a copy of the full committee recommendation.

The Academy held a ground-breaking ceremony on the site in October 1988 and erected a sign on the property with a picture of the proposed synagogue and the text in Hebrew characters.

The Academy has spent about two and a half million dollars to develop Sites 4A, 4B, and 4C. Of that amount about $300,000 went to build the Rebbe's residence. Since October of 1988 the Academy has engaged in substantial fund raising efforts to develop Site 4. It has raised about three million dollars and has about six million dollars in commitments.

## II.

Plaintiffs' contentions are based on the First Amendment to the United States Constitution prohibiting Congress from making any "law respecting an establishment of religion or prohibiting the free exercise thereof" and on the Equal Protection and Due Process clauses of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1981, 1982 and 1983, as well as Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1964).

Plaintiffs argue that the sale by the City to the Academy violates the First Amendment because it (a) has "no secular purpose," (b) advances a religion, Hasidic Ju-

daism, and (c) causes "an excessive governmental entanglement with religion," citing *Lemon v. Kurtzman*, 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

Plaintiffs say the City violated their civil rights under the Equal Protection and Due Process clauses by selling Site 4 to white Hasidic interests with intent to discriminate against Latinos and African–Americans.

The City and the Academy deny these contentions on the merits and say that plaintiffs (a) have no standing to assert their claims, (b) have not suffered any legally cognizable injury, and (c) are barred by laches because of their lengthy delay in making their claims. The Academy also asks the court to impose sanctions against plaintiffs and their attorneys pursuant to Rule 11 of the Federal Rules of Civil Procedure for making meritless claims against the Academy.

## THE FIRST AMENDMENT

■ In determining whether the City violated the Establishment Clause of the First Amendment the court considers whether the sale to the Academy (1) had a secular purpose, (2) had as a "principal or primary effect" the advancement of a religion, and (3) caused "an excessive entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

Plaintiffs say there can be no secular purpose in selling land to Hasidic interests to construct a synagogue, "a religiously exclusive" yeshiva, and housing for the yeshiva faculty. As plaintiffs put it: "There can be no secular purpose to only having religiously exclusionary facilities on this site."

Plaintiffs do not go so far as to say that the City may not, in developing an urban renewal area, sell land to churches, synagogues and other religious organizations. Indeed, it is plain that an urban renewal plan may make provision for such sales. Only in that way can the municipality fulfill the needs or desires of those who live in the new community. The Supreme Court recognized as much, albeit in *dicta*, in *Ber-*

*man v. Parker*, 348 U.S. 26, 34–35, 75 S.Ct. 98, 103, 99 L.Ed. 27 (1954).

The testimony shows that the City had on various occasions sold urban renewal land to churches and other synagogues. In Area I itself Site 12 was tentatively designated for development by an Hispanic Pentecostal Church with a congregation of about 500. The reason that this church eventually did not develop the site was because it decided to locate outside Area I.

Plaintiffs do not say that there could be no secular purpose in selling Site 4 to a religious organization but rather that such a sale to the Academy, an Hasidic organization, could not have a secular purpose because the Hasidim have a dogma and practices that are "exclusionary."

Acceptance of this position logically would mean that Hasidic religious organizations could never buy public lands for a synagogue or other religious purposes even though the congregants living in the area would, in accordance with their doctrine, have to walk to services on the Sabbath. A refusal to make any sales to Hasidim would be suspect as a possible violation of the Free Exercise Clause assured by the First Amendment.

It is true that the Hasidim embrace a doctrine and engage in practices that may seem strange to plaintiffs. Services in the Hasidic synagogues are conducted in a language unlikely to be understood by them. Perhaps very few of those people the plaintiffs represent would be apt to attend such services or to seek to send their children to an Hasidic school, conducting classes in an unknown tongue or giving instruction in a different religion. In the sense that plaintiffs and most other people not Hasidic would have no motivation to participate in the activities of the synagogue or the school, the facilities will in fact be more or less "exclusively" for Jews, although non-Hasidim on occasion have attended and observed the synagogue services.

But in the same sense any religious house of worship or religious school tends to be largely exclusive. If a sale, not a gift, of urban renewal land to a church can

have a secular purpose, the court can find no justification for applying a different rule to the Hasidim. The court concludes that there was a secular purpose in selling Site 4 to the Academy to service inhabitants of Area I.

Plaintiffs say that the "cumulative effect" over the years of purchases by Hasidic interests in Area I for non-religious as well as religious uses "will inexorably lead to the establishment of a religiously and racially exclusive Hasidic enclave." But this hardly addresses that question of whether the sale of Site 4 had the requisite secular purpose.

The court will discuss the contention of "cumulative effect" in its treatment of plaintiffs' arguments under the Equal Protection and Due Process clauses of the Fourteenth Amendment.

Plaintiffs' contention that the sale of Site 4 to the Academy has the primary effect of advancing Hasidic Judaism is partly based on the premise that the City "handed over" the property to the Academy, citing cases involving grants to religious organizations. The premise is faulty. The Academy purchased the land at market value. The City did not expend public funds to accommodate the desires of a religious sect or to promote a tenet of a sect's religious doctrine. The Academy has received no greater benefit than any other individual or organization with sufficient funds to purchase land from the City at market value. *See Ellis v. City of Grand Rapids*, 257 F.Supp. 564 (W.D.Mich.1966); *64th Street Residences v. City of New York*, 4 N.Y.2d 268, 174 N.Y.S.2d 1, 150 N.E.2d 396 (Ct. App.1958). *Cf. Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235 (2d Cir.1986); *Bollenbach v. Monroe–Woodbury Cent. Sch. Dist.*, 659 F.Supp. 1450 (S.D.N.Y. 1987).

Plaintiffs say that the plan to build a synagogue, yeshiva, and faculty housing "and the agreements surrounding that plan" foster "excessive governmental entanglement" with religion. Insofar as the assertion is that the administration of the so-called cross subsidy fund agreement causes excessive religious entanglement with government, the court does not consider the contention. This suit has not put in issue under the First Amendment either the validity of that agreement or the manner in which expenditures from the fund have been made to create low income housing.

One of the present three leaders of plaintiff Housing Committee asked at the Community Board hearing in 1984 that the proceeds from the sale in Site 4 be placed in the cross-subsidy fund. If plaintiffs wish either to set aside the agreement and require the deposit of those funds in the City's general account or to revise the procedure for determining the housing projects to receive funds, they are free to bring action to achieve those ends.

Plaintiffs suggest that there will be "excessive entanglement" because the sale of Site 4 to the Academy will have the effect of "continuing political strife" over aid to religion. *See Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 794, 93 S.Ct. 2955, 2976, 37 L.Ed.2d 948 (1973); *Meek v. Pittenger*, 421 U.S. 349, 372, 95 S.Ct. 1753, 1766, 44 L.Ed.2d 217 (1975).

The cited cases concerned the validity of continuing aid to church related schools. No doubt for years there has been recurrent if not continual political strife between the Hasidic and Hispanic communities in Williamsburg. Much as this court might wish otherwise, there seems to be no lively prospect that anything this court decides will end or even mitigate that strife.

However that may be, the concept of "entanglement" in violation of the First Amendment has to do with continuing involvement of government with religious organizations. The completed sale of Site 4 does not constitute an on-going relationship between the City and the Academy. That there is now political opposition to allowing the Academy to develop the property for the announced purposes for which it was conveyed in 1980 and 1988 is not enough to show excessive entanglement violative of the First Amendment. *Cf. Lynch v. Donnelly*, 465 U.S. 668, 684, 104 S.Ct. 1355, 1365, 79 L.Ed.2d 604 (1984).

## DUE PROCESS AND EQUAL PROTECTION

 Plaintiffs contend that in selling Site 4 to the Academy the City acted with an "invidious discriminatory purpose" and "engaged in intentional discrimination" against Latino and African–American residents of the Williamsburg neighborhood and in favor of the Hasidim, in violation of the Due Process and Equal Protection clauses of the Fourteenth Amendment. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–67, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977); *United States v. Yonkers*, 624 F.Supp. 1276 (S.D.N.Y.1985), *aff'd*, 837 F.2d 1181, 1221–22 (2d Cir.), *cert. den.*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1987).

There is no admissible direct evidence that the City decision makers had such an intent. The court does not consider inadmissable hearsay and rumors.

Plaintiffs' main argument is that because City officials were aware of the segregationist tendencies of the all-white Hasidic community the court should infer that the City acted with discriminatory intent in selling the land.

The Hasidim do segregate themselves to a certain extent through an adherence to religious and dietary laws and the use of a language not shared with many others. For example, while Academy officials stated at trial that a nonJewish child could attend a yeshiva of the Academy, such attendance is at best unlikely because classes are taught in Yiddish and all students must obey the sect's rules of conduct. Similarly, while the Academy has suggested it would offer use of the yeshiva dining area as a catering hall for other community members, the Academy's requirement that users observe the dietary laws makes non-Jewish use improbable.

City officials were doubtless aware of the practices of the Hasidim. Their distinctive customs of the Hasidim are apparent to those who work with them and perhaps to a large degree are a matter of public knowledge in the City.

The Supreme Court has made a distinction between the awareness of an official of the discriminatory effect of a decision and the intent of an official to discriminate. In *Personnel Administrator v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), the Supreme Court held that in order to find discriminatory purpose, the court must conclude that "the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not · merely 'in spite of,' its adverse effects upon an identifiable group." 442 U.S. at 279, 99 S.Ct. at 2296. To succeed plaintiffs must show that the City officials sold the property to the Hasidim because they would segregate themselves from non-Hasidim.

A plaintiff may, of course, establish discriminatory intent through circumstantial evidence. The *Arlington Heights* case directs courts to undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266, 97 S.Ct. at 564. Relevant factors include (1) the degree of any discriminatory effect of the action, (2) its historical background, (3) the sequence of events that led to the action, (4) the presence or absence of departures from normal procedures or substantive criteria, and (5) the legislative or administrative history of the action. 429 U.S. at 267–68, 97 S.Ct. at 564–65. *United States v. Yonkers Board of Education, supra; United States v. City of Parma, Ohio*, 494 F.Supp. 1049, 1054 (N.D.Ohio 1980). Whatever discriminatory effect the City's actions have had, they have not created the Hasidic enclave that plaintiffs envisage. The majority of housing units in Area I are integrated, as the figures cited above show.

It is true that those parcels designated for development at market rate housing have been sold at appraised value to whites and primarily to Hasidim. Also, the parcels set aside for institutional use have largely been sold at market rates, one of them at auction, to the Hasidic community. To that extent, given the Hasidic doctrine and practices, there may well be some segregative result.

But in considering whether the court should draw an inference of discriminatory purpose from this effect, the court must consider the alternatives available to the decisionmaker. *See Personnel Administrator v. Feeney, supra,* 442 U.S. at 283, 99 S.Ct. at 2298 (Marshall, J. dissenting); *Clients' Council v. Pierce,* 711 F.2d 1406, 1409 (8th Cir.1983); *see also* Note, *Discriminatory Purpose and Disproportionate Impact: An Assessment after Feeney,* 79 Colum.L.Rev. 1376, 1394, 1411 (1980). If the City had no reasonable alternative in complying with the Urban Renewal plan, the court may not fairly infer a hidden motive to favor Hasidim and discriminate against Hispanics and Blacks.

No minority group developer or non-Hasidic organization was found or came forward with alternative proposals for development of the market-rate housing and institutional parcels the Academy bought. The Development Department did not bar non-Hasidim from making proposals.

The Constitution does not require the City to restrict the types of housing in the area to subsidized housing. This might tend to foster segregated neighborhoods. Nor does the Constitution require the City to leave institutional parcels vacant because a non-Hasidic organizations cannot be found to develop them.

Plaintiffs suggest that instead of selling to Jewish interests the City should have reserved more land in Area I for parks or manufacturing. The plan does provide for these uses, and plaintiffs have not shown that the amount of such land is constitutionally inappropriate or so inadequate as to evidence a hidden intent to discriminate against them.

Plaintiffs say that the City's policy in the 1970s and early 1980s of dealing with prospective purchases on a sole source basis invites suspicion that designation of white Hasidim was made to discriminate against plaintiffs. In the early 1980s the City changed the policy while still honoring the commitments of previous administrations. The City began to use, in most instances, a request for proposals process whereby the City requested proposals for development of a site and mailed the request to thousands of people.

The court is satisfied from the testimony that the Development Department made a good faith effort to seek out on the merits developers to implement the Plan. Moreover, the criteria used by the City in making designations under the sole-source policy appear rational and not invidiously discriminatory.

Organizations previously established in the community who had succeeded in development projects were sensible choices for future projects. Had others sought to develop Site 4 for institutional (that is, non-residential) use and been denied the opportunity, the plaintiff's contention might be more persuasive. No such persons appeared at any stage. Moreover, the Development Department's initial designation, using the sole-source policy, of the Hispanic Pentecostal Church as developer of another site is hardly consistent with an intent to create an Hasidic enclave.

Plaintiffs also argue that there was a departure from normal procedure evidencing a discriminatory intent. They say that the Development Department was required in 1988 to subject the actual conveyance of Sites 4A and 4B to the Review Procedure. Indeed, at one time Siegel was of the opinion that the department was required to do so. Only after counsel for the Academy pointed out that the disposition to the Academy had already been approved in 1979, and that the 1984 amendments to the plan had been through the Review Procedure, did Siegel consult with City attorneys and on their advice decide that the conveyance need not go through the Review Procedure yet again. Plaintiffs did not establish that this advice was faulty.

Before the deed passed in 1988 the Development Department submitted the matter to the Community Board's Review Procedure Committee. The Board of Estimate had conditioned the passing of title on the Development Department's commitment to make a submission to the Community Board. The Development Department did that and appeared as requested before the Community Board's Review Procedure

Committee, which approved the conveyance.

This court does not infer from this entire incident that Siegel had a racially discriminatory purpose. There is nothing in the minutes of the meeting of the Community Board's Review Procedure Committee suggesting that anyone attributed to him an invidious purpose. No one appeared to argue to the Board of Estimate that the failure to resubmit the disposition to the Academy to the full Review Procedure bespoke a racially discriminatory intent. The court finds no basis for plaintiffs' accusation that the City accomplished the sale of Sites 4A and 4B through a devious "sleight-of-hand" or by departing from normal procedural standards.

Plaintiffs also contend that the cross-subsidy policy itself, widely hailed at the time it was announced with much fanfare by the Mayor at City Hall as a way to get the conflicting Hispanic and Hasidic groups to work together, was instead a product of a racially discriminatory motive. The argument is that most of the parcels available for subsidized housing to which the cross-subsidy fund was to be devoted were in Area II, inhabited largely by Hispanics, and that because the new or rehabilitated subsidized housing would likely be occupied by Hispanics the purpose was further to segregate them in Area II.

According to the testimony of former Commissioner Anthony Gliedman, the area in which the cross-subsidy funds were to be spent was not restricted to Area II. But in any event the same accusation could be made had the funds expended for subsidized housing been available from some other source.

The Hispanics were pushing hard for subsidized housing wherever it could be placed in Williamsburg. There would have been no substantial moneys for such housing in the absence of sales of property and the deposit of the proceeds in the cross-subsidy fund. The only large amounts of open space available for sale were in Area I. To have created such space in Area II would have required the demolition of existing buildings. The Hispanic community obviously did not wish that, and Commissioner Gliedman did not even consider it.

Hispanics generally and the Community Board in particular enthusiastically supported the creation and implementation of the cross-subsidy fund. Even with that fund the Hispanics believed, as plaintiffs' brief states, that the City gave "only the most minimal help" toward developing subsidized housing in Area II, despite the efforts of an Ad Hoc Committee of Hispanics and African–Americans seeking to preserve such housing there.

The chief subject of controversy between the Hispanic and Hasidic communities over the years has been housing. Both groups have had a need to expand. Both wished for more subsidized housing. But proportionately more Hispanics than Hasidim required such housing. With the drying up of federal and state funds, it seemed only good sense to earmark, for the subsidization of needed housing, moneys raised to purchase land at market rates.

The court finds that Commissioner Gliedman conceived the cross-subsidy idea not to discriminate against Hispanics but as a practical way to help them achieve the goal they sought.

Plaintiffs ask the court to consider the cumulation of all of the City's decisions with respect to Site 4, and to infer that the City's decision makers were actuated, at least in part, from 1977 on by an intent to discriminate against Hispanics and in favor of the Hasidim. Even disregarding the changes over the years in personnel in the Development Department, the Community Board, the Planning Commission, and the Board of Estimate, the court cannot fairly draw that inference.

For reasons detailed above, it was logical in 1977 to choose an organization such as the Academy to develop an institutional use of the site. In 1979 the Community Board members, presumably a cross-section of the community, voted after public hearings unanimously to approve the dispositions to the Academy. Both the Planning Commission and the Board of Estimate held hearings and approved the sale in 1979. There

is no evidence that anyone came forward to object at any of these hearings.

In 1984 the Community Board at a public hearing focused on the sale of Sites 4A and 4B to the Academy for a boys yeshiva and faculty housing and approved the sale.

At the Planning Commission public hearing in 1984 both a representative of the Community Board as well as a spokesman for Epiphany Church, whose members were mostly Hispanic, urged approval of the proposal. The church spokesman presented a petition with 1100 signatures. There is no evidence that anyone appeared in opposition, and the Planning Commission approved it.

There is no evidence that anyone appeared in opposition to the proposal when it appeared for public hearing before the Board of Estimate in 1984, and it in turn approved.

In 1988 the Review Procedure Committee of the Community Board addressed the question of the Academy's construction on the site of a 6,000 seat synagogue, a yeshiva, and faculty housing. The Committee approved, sending a copy of the recommendation to the Mayor over the signatures of the Chairman of the Committee and the Chairman of the Community Board. No one appeared in opposition at the hearing held by the Board of Estimate.

The choice of the Academy to develop Site 4 apparently did not arouse significant opposition at any point after that first designation in 1977. As far as the record shows, no one ever throughout the years alerted the Board of Estimate, the ultimate decision maker, to the possibility that the sale was, at least in part, based upon an intent to discriminate or even had the effect of discriminating in favor of Hasidim and against Hispanics. It is hard to attribute an invidious motive to the Board of Estimate when no one suggested to it that such a motive was at work in the pertinent agencies, the Community Board, or the Planning Commission.

During all the years when Site 4 appeared on calendars for public hearings the identity of the Academy as an Hasidic organization was well known. Moreover, the dogma and practices of the Hasidim were not secrets discovered only after the final conveyance had been made to the Academy.

Several law suits brought by Hispanics had made that dogma and those practices, as well as the propensity of the Hasidim to remain separate from the rest of society, a matter of public record. *See Parents' Ass'n of P.S. 16 v. Quinones,* 803 F.2d 1235 (2d Cir.1986); *Almonte v. Pierce,* 666 F.Supp. 517 (S.D.N.Y.1987); *Williamsburg, etc. v. N.Y. City Housing Authority,* 493 F.Supp. 1225 (S.D.N.Y.1980); *Williamsburg Fair Housing v. New York City Housing,* 450 F.Supp. 602 (S.D.N.Y. 1978). The Hispanics had not been loathe to protest publicly what they regarded as an infringement on their civil rights in favor of Hasidim.

On the basis of all the evidence in the record the court finds that the plaintiffs have not met their burden of showing that the City invidiously discriminated against Hispanics and in favor of the Hasidim.

## DEFENDANTS' OTHER CONTENTIONS

Because the court has decided the merits against plaintiffs it does not address defendants' contentions that plaintiffs have no standing to make a claim, suffered no legally cognizable injury, and forfeited their claims by laches.

The court has considered the Academy's application for the imposition of sanctions against plaintiffs and their attorneys. The court denies the application.

## CONCLUSION

The foregoing constitutes the court's findings of fact and conclusions of law. Preliminary and permanent injunction denied. So ordered.