United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3250

_____

| | | |
|---|---|---|
| Matthew Stark, Marcia Neely, | * | |
| | * | |
| Plaintiffs/Appellees, | * | |
| | * | |
| v. | * | |
| | * | |
| Independent School District, | * | |
| No. 640, and the members of | * | |
| its Board of Directors, | * | |
| | * | |
| Defendant/Appellant, | * | Appeal from the United States |
| | * | District Court for the |
| Leon Plaetz, Curtis Trost, | * | District of Minnesota. |
| Scott Frederickson, Tom Franta, | * | |
| Barb Beranek, Alois Guetter, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| _____ | * | |
| | * | |
| Jeff Paskewitz, Mavis | * | |
| Paskewitz, Stuart Paskewitz, | * | |
| Ben Paskewitz, Ron Paskewitz, | * | |
| Naomi Paskewitz, Carrie | * | |
| Paskewitz, Joe Paskewitz, | * | |
| Gordon Barber, Twyla Barber, | * | |
| Peter Barber, Cindy Logan, | * | |
| Sheldon Logan, Joanna Logan, | * | |
| Clayton Paskewitz, Linda | * | |

Paskewitz, Trisha Paskewitz,　　　　　*
Minnesota Education Association,　　*
Minnesota Federation of　　　　　　*
Teachers,　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　*
　　　　　　Amicus Curiae.　　　　*

_____

Submitted:  November 20, 1996

Filed:   August 21, 1997
_____

Before WOLLMAN, BEAM, and MURPHY, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

This is an appeal from an injunction enjoining the operation of a public school. We reverse and remand with directions to dismiss the complaint.

## Factual Background

Independent School District No. 640 (the district) is a rural school district located in southwestern Minnesota. It covers approximately 225 square miles of agricultural land, including the towns of Wabasso and Vesta. The district operated elementary schools in both Wabasso and Vesta until the 1983-84 school year. It closed the Vesta elementary school and sold the building in May 1984. Thereafter, the Vesta children attended the Wabasso school, which is approximately fourteen miles from Vesta.

Lloyd Paskewitz bought the old Vesta elementary school building in 1991. Paskewitz and several other Vesta families are members of a religious group known as the Brethren, a group that originated in Dublin, Ireland, in the late 1820s.[1] See Bryan Ronald Wilson, "The Brethren" A Recent Sociological Study (1981). (Appellees' App. Ex. W.) It is undisputed that the Brethren have a sincerely held religious belief in avoiding the use of technology, including televisions, radios, videos, films, and computers.

In August 1992, Paskewitz, on behalf of several of the Vesta Brethren families, wrote to Dr. George Bates, the district's superintendent, about the possibility of reopening the Vesta elementary school in the form of a multi-age classroom. Paskewitz offered to lease space in the old school to the district in consideration of the district's providing a teacher and supplies. Paskewitz's letter stated, "[w]e would have no objection to it being a public school," but requested that "the charter of the school in Vesta" contain a clause stating "[t]hat no T.V., Radios, Videos, and Computers be used." Paskewitz stated that there were approximately twenty-one Brethren children that would be interested in attending and that the group had heard that other, non-Brethren children might be interested in attending the Vesta school. Paskewitz's letter also noted that the Brethren children would not require transportation or school lunches, as the children could walk to school and would go home for lunch in accordance with their religious beliefs.

Dr. Bates attested that he considered the feasibility of opening a multi-age classroom in Vesta. He stated that the primary benefits of such a classroom included the reduction in the number of students being bussed to Wabasso, the availability of an additional multi-age classroom, the reduction in class sizes in grade-specific classrooms, and the alleviation of space shortage in the Wabasso building. He noted

---

[1]Paskewitz estimated that approximately 115 of the 300 people living in Vesta are members of the Brethren.

that the relative costs of the proposed classroom were minimal. After holding public meetings, the school board unanimously approved the proposal. Members of the school board attested that they approved the opening of the Vesta school for several reasons, most of which were financial. Opening the Vesta school would prevent the Brethren children from possibly being home-schooled, which would have meant a loss in state aid of roughly $3,200 for each student withdrawn from school. A Vesta school eliminated the need to bus Vesta students to Wabasso, and it was more economical to send one teacher to Vesta than to bus Vesta children to Wabasso. Additionally, opening a multi-age classroom in Vesta would provide educational benefits for those students who otherwise might have been home-schooled. Dr. Bates and the school board members attested that during the approval process they did not discuss the religious backgrounds of the parents or students who might attend the Vesta school, nor were those religious backgrounds relevant to their decision.

A three-year lease was signed on October 12, 1993, by the district, Paskewitz, and the Brethren.[2] The lease provided that the Vesta school would be operated by the district in the form of a multi-age classroom and would be "a public school for any resident student in the School District." The district would provide teachers and administrative services, establish the curriculum "in compliance with state laws and rules," and provide classroom materials for instruction. The parents of the Brethren children would "have the right to comment on and provide input regarding" classroom materials "to the same extent as other parents in the School District," but the district retained "the sole discretion" regarding "final approval" of textbooks and instructional materials. The lease provided that "[t]he School District shall, to the extent permitted under applicable law and rules and regulations . . . limit the use of technology such as

---

[2]Although the "Brethern" [sic] was an additional party to the lease, the person who signed the lease allegedly on the Brethren's behalf has attested that he had no authority to do so. Furthermore, there is no evidence in the record that the Brethren had any ownership interest in the Vesta school building. Thus, we find little significance in the fact that they are a party to the lease.

television, radio, audio and/or video recordings, computers and movies in the classrooms at the school." The district would provide special education, certain federally funded educational services, and counseling services, as well as instruction in health, physical education, and music at the Wabasso School to any Vesta students needing them.[3] The lease stated that "[a]ll policies adopted by the [School District] . . . shall apply at the [Vesta] school." Paskewitz and the Brethren agreed to pay all utilities, provide custodial services, repair and maintain the building and grounds, pay property taxes, provide property and liability insurance related to the building, and remove snow.

The district planned to operate three multi-age classrooms during the 1993-94 school year, two in Wabasso and one in Vesta. The district solicited students for these classrooms, and fifty-four students signed up and were allowed to request which school they wished to attend. Thirty-five chose the Wabasso school, and the remaining nineteen chose the Vesta school. Eleven parents of twenty-nine current or former Vesta students attested that they preferred sending their children to the Vesta school rather than the Wabasso school because they liked the convenience of having their children attend a school within walking distance and having their children come home for lunch. They also preferred the multi-age Vesta classroom to a grade-specific one in Wabasso.[4] Although the Vesta school is open to any student in the district who wishes to attend there, apparently only Brethren children have attended the Vesta school since it opened.

---

[3]The lease stated that hot lunch would also be provided at the Wabasso school, but the district has said that it would cater hot lunches to students at the Vesta school if needed.

[4]The multi-age classrooms in Wabasso were open only for the 1993-94 school year.

Dr. Bates and the two Vesta teachers attested that the same elementary curriculum is taught at the Vesta school as is taught at the Wabasso school. Technology, in the form of computer instruction, is a standard part of that curriculum for each grade level. The teachers testified that when the Vesta school first opened, students wishing computer instruction would have been bussed to the Wabasso school to receive it. Both attested that the district now provides computer and audio/visual equipment to them at the Vesta school upon request. Although technology is available to all students, both teachers testified that they do not regularly use technology in their classroom instruction.

Minnesota law requires school districts to establish a procedure that allows parents to review the content of instructional materials provided to a minor child. If the parent objects to that content, the district must make reasonable arrangements for alternative instruction. See Minn. Stat. Ann. § 126.699 (West 1994). The district's policy allows students with religious objections to be excused from objectionable classes or activities. If the class or activity is a required one, "suitable alternative activities shall be provided." Dr. Bates attested that the district has received numerous objections to various activities, including the use of computer technology, drug education, self-esteem training, certain books and audio and visual presentations, and sex education; that the district does not inquire into the motivations for a parent's objections; and that the district provides alternative instruction.

All of the Brethren parents have objected to the use of computers at the Vesta school and have asked for alternative instruction for their children, which has been provided. Accordingly, the educational curriculum at the Vesta school does not include the use of computers, videos, films, or audio presentations. While the Brethren children were attending the Wabasso school prior to the reopening of the Vesta school, the district accommodated their religious objections and allowed them to avoid

-6-

participating in the use of technology.[5]  It is undisputed that, in light of the accommodations the district would make at the Wabasso school for the Brethren children, the Brethren children have received exactly the same education at the Vesta school that they would have received if they had continued to attend the Wabasso school.  It is also undisputed that no religious instruction has taken place at the Vesta school and that no religious artifacts are present.

## Procedural History

Matthew Stark and Marcia Neely are Minnesota citizens utilizing taxpayer standing who filed suit against the district[6] seeking a declaratory judgment that the creation and operation of the Vesta school violates the Establishment Clause of the First Amendment to the United States Constitution and article 1 section 16 of the Minnesota Constitution.  They also sought an injunction prohibiting the district from operating the Vesta school in conformance with Brethren beliefs, a judgment requiring the district to refund to the State of Minnesota all state aid the district received for children attending the Vesta school, and an award of attorney fees.

The case was submitted to the district court on cross-motions for summary judgment.  The court concluded that "the facts presented by this case provide a clear example of state sponsorship, or the advancement of a religion which violates the mandates of the First Amendment."  The court concluded that the district had modified the Vesta school's curriculum "based solely on the request of a religious group."

---

[5]The district also supplied the Brethren children with a separate lunch table at the Wabasso school.

[6]The plaintiffs also sued members of the school board, Paskewitz, and the Brethren.  These defendants were dismissed at various times, and their dismissals are not raised on appeal.

The district court further concluded that the primary effect of the opening of the Vesta school was that of promoting religion; that "the opening, and the manner of operation of, the Vesta school lacks a secular purpose and was done to conform to the religious beliefs of the Brethren"; and that the district had thus created "an impermissible identification of its powers and duties with the religious beliefs of the Brethren." The court entered an injunction permanently enjoining the district "from operating the Vesta School or any other school in conformance with the Brethren's religious objections to the use of computers and other technology and media." The court did not rule on the refunding of state aid money or on the matter of attorney fees.

Following the district court's denial of the district's motion for a stay pending appeal, we entered an order staying the district court's injunction. Stark and Neely have moved to dissolve the stay. Stark and Neely have dismissed their refund claim, and their claim for attorney fees has been stayed pending the outcome of this appeal.

## First Amendment

We begin by noting that the decision by the district to open a school and to accommodate parental requests for exemption from aspects of the district's chosen curriculum falls within the heartland of the "comprehensive powers and substantial discretion" that are generally afforded to school districts in "discharg[ing] the important tasks entrusted to them." Pratt v. Independent Sch. Dist. No. 831, 670 F.2d 771, 775 (8th Cir. 1982). See Wisconsin v. Yoder, 406 U.S. 205, 235 (1972) ("[C]ourts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education."). Despite this considerable discretion, courts have recognized that school boards must exercise their powers "'in a manner that comports with the transcendent imperatives of the First Amendment,'" and courts "have been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." Edwards v.

Aguillard, 482 U.S. 578, 583-84 (1987) (quoting Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 864 (1982)).

As the Supreme Court has stated, courts "do not . . . intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." Epperson v. Arkansas, 393 U.S. 97, 104 (1968). Cf. Capitol Square Review and Advisory Bd. v. Pinette, 115 S. Ct. 2440, 2448 (1995) (plurality opinion) ("[O]utsiders or individual members of the community uninformed about the school's practice. . . . *might* leap to the erroneous conclusion of state endorsement.").

## A.

The applicable test for evaluating whether state action has violated the Establishment Clause is that established by Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971). See Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 389 n.7 (1993) ("Lemon, however frightening it may be to some, has not been overruled."). "In order to satisfy the Lemon test, a challenged governmental action must (1) have a secular purpose, (2) not have the primary or principal effect of advancing religion, and (3) not foster an excessive entanglement with religion." Good News/Good Sports Club v. School Dist. of Ladue, 28 F.3d 1501, 1508 (8th Cir. 1994) (footnote omitted) (citing Lemon, 403 U.S. at 612-13). See also Agostini v. Felton, Nos. 96-552 & 96-553, 1997 WL 338583, at *19 (U.S. June 23, 1997) ("Thus, it is simplest to recognize why entanglement is significant and treat it . . . as an aspect of the inquiry into a statute's effect.").

The decision to open a school in Vesta furthers the valid secular purpose of educating the district's children. See Mueller v. Allen, 463 U.S. 388, 395 (1983) (state has "secular purpose of ensuring that the State's citizenry is well educated"); Wolman v. Walter, 433 U.S. 229, 240 (1977) ("There is no question that the State has a

substantial and legitimate interest in insuring that its youth receive an adequate secular education."); Everson v. Board of Educ. of Ewing Tp., 330 U.S. 1, 7 (1947) ("It is much too late to argue that legislation intended to facilitate the opportunity of children to get a secular education serves no public purpose."). The district's decision to open the school in Vesta was based upon the secular reasons of space efficiency, savings in transportation costs, and the addition of a multi-age classroom and corresponding reduction in class sizes. Further, the decision forestalled the plans of certain parents to home-school their children and thus prevented a reduction in the amount of state aid flowing to the district, funding that benefits all students within the district.

Relying primarily on School Dist. of Grand Rapids v. Ball, 473 U.S. 373 (1985), and Parents Ass'n of P.S. 16 v. Quinones, 803 F.2d 1235 (2d Cir. 1986), the district court concluded that the primary effect of the district's decision to open the school at Vesta was to promote religion. The court noted that the Vesta school is perceived as a Brethren school and that the district had thus "create[d] an impermissible identification of its powers and duties with the religious beliefs of the Brethren."

Quinones involved a plan to educate Hasidic Jewish girls at a public school by physically separating a group of classrooms from the rest of the school and dedicating them for their use, and providing only female public school teachers who would teach primarily in Yiddish, with English taught as a second language. See Quinones, 803 F.2d at 1237. The Second Circuit concluded that this plan created "a symbolic link between the state and the Hasidic sect" which appeared to endorse the separatist religious views of the Hasidic Jews and that the plan thus failed the primary effect test. See id. at 1241-42.

This case is distinguishable because the Vesta school does not involve the complete segregation and dedication of part or all of a public facility to a group of students for religious reasons as in Quinones. That portion of Grand Rapids on which

the district court relied has now been overruled.  See Agostini, 1997 WL 338583, at **16, 21.

The Vesta school is a public school open to all, and there is no evidence that any students wishing to attend there have been turned away.  Further, that the school board's decision to open the Vesta school coincided with certain parents' desire to see a public school opened in Vesta does not compel a finding that the primary effect of the decision was to advance religion or that the district was sending a message of approval or disapproval of individual religious choices.  See Clayton by Clayton v. Place, 884 F.2d 376, 380 (8th Cir. 1989) ("The mere fact a governmental body takes action that coincides with the . . . desires of a particular religious group . . . does not transform the action into an impermissible establishment of religion.").  Any incidental benefits to the Brethren's religious beliefs are secondary to the primary effect of providing an additional school for the secular education of Vesta children.  Cf. Good News/Good Sports Club, 28 F.3d at 1508 (incidental benefits to religion from policy of allowing group access to school property were secondary to primary effect of providing neutral forum for exchange of ideas).

Although a district may not modify its curriculum to conform to a set of sectarian beliefs,  see Edwards v. Aguillard, 482 U.S. at 593; Epperson v. Arkansas, 393 U.S. at 106;  Pratt, 670 F.2d at 776-79 (removal of film from curriculum), nothing of the sort has happened here.  As evidenced by the material submitted to the district court, the district's curriculum has not been altered in any way at the Vesta school, and the same curriculum is taught at Vesta as at the Wabasso school.  While technology was not initially provided at the Vesta school, and students not exempted from it would have been bussed to Wabasso to receive it, the record shows that technology is now available at the Vesta school.  Thus, contrary to the district court's finding, technology has never been unavailable to students at the Vesta school.  In sum, the curriculum-- whether the substantive curriculum or the availability of technology--has not been

modified or changed in any way at the Vesta school from what is taught at the Wabasso school.

The district granted the parental requests for exemption from technology pursuant to Minn. Stat. Ann. § 126.699 and district policy. Granting the parental requests made pursuant to the statute and the policy served the secular purpose of facilitating the secular education of children at the Vesta school. Even if the district's decision to honor the requests for exemption was motivated by a desire to accommodate the Brethren parents' religious beliefs, such accommodation constitutes a legitimate secular purpose so long as "the relevant governmental decisionmaker . . . [does not] abandon[] neutrality and act[] with the intent of promoting a particular point of view in religious matters." See Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 334-35 (1987); see also Lynch, 465 U.S. at 673 ("Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any."). The record shows that the district honors all parental exemption requests, regardless of motivation.

The district's actions in granting the parental requests for exemption did not have the primary effect of advancing religion. "A law is not unconstitutional simply because it *allows* churches to advance religion . . . . For a law to have forbidden "effects" under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence." Amos, 483 U.S. at 337. Although the religious beliefs of the Brethren parents were accommodated by the granting of their requests for exemptions, the district itself did not advance religion by honoring those requests. See id. at 336-37 (any advancement of religion as a result of exemption for religious groups in Civil Rights Act of 1964 could not be "fairly attributed" to the government).

We conclude that the district's application of state law and district policy to grant parental requests for exemption will not result in any excessive entanglement.

Because the record shows that the district grants all parental exemption requests and routinely provides alternative instruction, its policy actually "promotes less, rather than more," involvement with religion because the district avoids considering parents' motivations--including religious motivations--for requesting exemptions. See Clayton, 884 F.2d at 379; Good News/Good Sports Club, 28 F.3d at 1510 (no excessive entanglement where, in applying open-access school use policy, school would not have to distinguish among types of groups wanting to use school). The teachers have altered their teaching methods only to the extent necessary to accommodate the parental exemption requests, as they would any exemption request. See Agostini, 1997 WL 338583, at *20 ("Entanglement must be 'excessive' before it runs afoul of the Establishment Clause."); Wolman, 433 U.S. at 248 ("It can hardly be said that the supervision of public employees performing public functions on public property creates an excessive entanglement between church and state."); cf. Mueller, 463 U.S. at 403 (no excessive entanglement from requirement that state officials examine textbooks to determine if they qualify for tax deduction so that deductions for sectarian books could be disallowed).

In conclusion, neither the decision to open the Vesta school nor the district's application of the exemption policies violates the Lemon test. Both actions had a secular purpose and did not have the primary effect of advancing religion or endorsing the Brethren's religious beliefs. Cf. Agostini, 1997 WL 338583, at *21.

**B.**

Stark and Neely argue that the present case involves a situation that is indistinguishable from that in Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687 (1994). In that case, the Supreme Court held unconstitutional a special state statute which created a school district for a village defined exclusively along religious lines. See id., 512 U.S. at 693. The "fundamental source of constitutional concern" in Kiryas Joel was that the legislature had not exercised its

power in a manner neutral to religion. See id. at 703. The Court was concerned that "[b]ecause the religious community of Kiryas Joel did not receive its new governmental authority simply as one of many communities eligible for equal treatment under a general law, we have no assurance that the next similarly situated group seeking a school district of its own will receive one." Id. (footnote omitted). This lack of neutrality forced the Court to conclude that the creation of the school district violated the Establishment Clause. See id. at 704-05. Further, the legislation could not be saved by viewing it as an accommodation of religion because the "proposed accommodation singles out a particular religious sect for special treatment," violating the principle of "neutrality as among religions." Id. at 706-07.

This case is not Kiryas Joel. As we discussed earlier, the record does not support Stark's and Neely's contention that the district has taken special actions to wrongly benefit the Brethren, and the fact that the district's actions coincide with the desires of certain parents does not mean that the Establishment Clause has been violated. See Clayton by Clayton, 884 F.2d at 380.[7] The district here decided, for secular reasons, to open a public school in a building in which a public school had previously been located, a school that is open to all students regardless of religious affiliation. The district grants the requests of all parents for exemptions regardless of religious affiliation.

The extension of a benefit through the neutral application of state law and the district's policy to allow parental requests for exemption from curriculum--even if those requests are motivated by the religious reasons of the parents and the honoring of the requests accommodates those religious beliefs--does not violate the Establishment Clause. The Supreme Court has said:

---

[7]There has been no delegation of political power to the Brethren community in this case. Cf. Kiryas Joel, 512 U.S. at 697-702 (plurality opinion) (delegation of political power to group chosen by religious criteria).

A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion. . . . We have held that the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose idealogies and viewpoints, including religious ones, are broad and diverse.

Rosenberger v. Rector and Visitors of the Univ. of Virginia, 115 S. Ct. 2510, 2521 (1995); see also Agostini, 1997 WL 338583, at *18 ("[W]here the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to religious and secular beneficiaries on a nondiscriminatory basis . . . the aid is less likely to have the effect of advancing religion.").

The state action in this case is well within the boundaries set by cases in which the Supreme Court has upheld "government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion." Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 8 (1993). See, e.g., Rosenberger, 115 S. Ct. at 2521-25 (neutral program paying for printing of student publications); Zobrest, 509 U.S. at 10-14 (sign-language interpreter for deaf student at Catholic high school); Witters v. Washington Dep't of Servs. for the Blind, 474 U.S. 481, 486-89 (1986) (vocational assistance for blind person studying for religious vocation at Christian college); Mueller, 463 U.S. at 396-99 (tax deduction for educational expenses); Widmar v. Vincent, 454 U.S. 263, 273-75 (1981) (open access to university facilities); Wolman, 433 U.S. at 237-48 (textbooks, testing, diagnostic and therapeutic services); Board of Educ. of Central Sch. Dist. No. 1 v. Allen, 392 U.S. 236, 243-44 (1968) (textbooks); Everson, 330 U.S. at 17 (bussing reimbursement). Indeed, by granting exemptions without regard to parental motivations, the district has adhered to the principle that "[a] proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of neutrality toward religion, favoring neither one religion

-16-

over others nor religious adherents collectively over nonadherents." Kiryas Joel, 512 U.S. at 696 (quotation omitted).

To the extent that the district's application of the state law and district policy to grant the parental requests for exemption can be viewed as accommodating religion by removing a burden from the Brethren families (forcing their children to use technology), such action does not offend the Establishment Clause. "[T]he Constitution [does not] require complete separation of church and state; it affirmatively mandates accommodation." Lynch, 465 U.S. at 673. The Establishment Clause is not violated when the government accommodates religious beliefs "by relieving people from generally applicable rules that interfere with their religious callings." Lee v. Weisman, 505 U.S. 577, 627 (1992) (Souter, J., concurring); id. at 628 ("accommodating religion reveals nothing beyond a recognition that general rules can unnecessarily offend the religious conscience when they offend the conscience of secular society not at all"); Amos, 483 U.S. at 334 ("This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." (quoted case omitted)). The district's actions in this case follow our best traditions of the accommodation of religious beliefs in the school context. See, e.g., Yoder, 406 U.S. at 234; Zorach v. Clauson, 343 U.S. 306, 312-15 (1952); West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943).

## C.

Finally, we examine the district's actions under the "endorsement test." See Kiryas Joel, 512 U.S. at 720 ("Experience proves that the Establishment Clause . . . cannot easily be reduced to a single test.") (O'Connor, J., concurring in part and concurring in the judgment). The Supreme Court has "paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause

jurisprudence." County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 592 (1989). The endorsement test has been thus explained:

> [T]he Establishment Clause "prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community." The government violates this prohibition if it endorses or disapproves of religion. "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."

Id. at 625 (O'Connor, concurring in part and concurring in the judgment) (quoting Lynch, 465 U.S. at 687-88 (O'Connor, J., concurring)).

As we have discussed, the district has acted neutrally in this case towards the citizens of the district regarding the decision to open the school in Vesta and in applying the exemption policy. Thus, the district has not made anyone's adherence to religion relevant to their standing in the community and consequently has not endorsed religion or a set of religious beliefs.

In sum, the district's actions in this case have not violated the Establishment Clause.

### Minnesota Constitution

We must also consider how the district's actions fare under the Minnesota Constitution, for the "limitations contained in the Minnesota Constitution are substantially more restrictive than those imposed by U.S. Const. Amend. I." Americans United Inc. v. Independent Sch. Dist. No. 622, 179 N.W.2d 146, 155 (Minn. 1970). The district court did not separately analyze the state constitutional

-18-

issue, but declared that because the district's actions violated the federal constitution they also violated the state constitution. The issue was briefed on appeal, however, and we exercise our discretion to resolve it because it can be decided as a matter of law. See Hutchins v. Champion Int'l Corp., 110 F.3d 1341, 1345 (8th Cir. 1997) (citing Talley v. United States Postal Serv., 720 F.2d 505, 508 (8th Cir. 1983)).

The Minnesota constitutional provisions preventing the establishment of religion provide in relevant part that "nor shall any money be drawn from the treasury for the benefit of any religious societies or religious or theological seminaries," Minn. Const. Art. I, § 16, and that "[i]n no case shall any public money or property be appropriated or used for the support of schools wherein the distinctive doctrines, creeds or tenets of any particular Christian or other religious sect are promulgated or taught." Minn. Const. Art. XIII, § 2. The "fundamental concept" is "that the state may neither advance nor inhibit religion, which . . . defines permissible limits of legislation under state . . . law." Americans United, 179 N.W.2d at 157. The "establishment clauses prohibit both 'benefits' and 'support' to schools teaching distinctive religious doctrines." Minnesota Fed'n of Teachers v. Mammenga, 500 N.W.2d 136, 138 (Minn. Ct. App. 1993).

As shown above, no religious instruction takes place at the Vesta school, and there is no expenditure of public funds in support of the teaching or promulgating of religious beliefs. Accordingly, we conclude that no violation of the state constitution has occurred.

## Conclusion

The injunction is vacated, and the case is remanded to the district court with directions to dismiss the complaint.

-19-

MURPHY, Circuit Judge, dissenting.

Because I believe that the establishment by the public school district of this special school in Vesta for children of the Brethren goes beyond what is permitted by the first amendment to the United States Constitution, I respectfully dissent.

The district entered into a contractual arrangement with the religious group known as the Brethren to operate a special public school in Vesta tailored to meet the group's religious concerns. Before 1984 the district operated two elementary schools: one in Wabasso and one fourteen miles away in Vesta. After the school in Vesta was closed for economic reasons, children of the Brethren either attended the regular public elementary school in Wabasso or were homeschooled. Various accommodations were made at Wabasso to respect the religious beliefs of the Brethren, such as providing separate tables for their children at lunch and excusing them from activities that involved technological devices. Their opposition to the use of technology includes any use of television, radio, audio and video recordings, computers, or movies.

During 1992-93, the Brethren proposed a joint venture with the school district to reopen the elementary school in Vesta and this proposal was approved at a meeting of the school board in February 1993. The minutes of the meeting and contemporaneous newspaper accounts indicate that the school was identified with the Brethren. One such news story stated in part:

> The Wabasso Board of Education has reached an agreement with the Vesta Brethren to proceed with plans for a K-6 elementary school at Vesta this fall.
>
> . . . .
>
> If it is legally possible to establish this school, it would be operated without the assistance of modern technology such as computers, and

video and audio equipment. The reasoning behind this is that the Brethren's religious beliefs prohibit them from using such items, and this has created a conflict in trying to send their children to the public school in Wabasso, which uses such teaching tools and methods.

To eliminate the need to remove these children from the public school environment and teach them at home, the Brethren made the proposal for a second school in Vesta last year.

Vicki L. Gerdes, "Agreement is Reached on Proposed School in Vesta," Redwood Gazette, June 17, 1993.

On October 12, 1993, the Brethren, the school district, and Lloyd Paskewitz entered into a formal written agreement to operate a public elementary school in Vesta.[8] Paskewitz had previously purchased the Vesta school building, and the building was made available under the agreement for the district to use free of charge. Paskewitz and the Brethren also agreed to be responsible for all maintenance, security, taxes, and insurance. In return the district would provide a teacher and educational materials and limit the use of technology. Section 6 of the Agreement provides:

> The School District shall, to the extent permitted under applicable law and rules and regulations adopted by the School Board of the School District, limit the use of technology such as television, radio, audio and/or video recordings, computers and movies in the classrooms at the school provided for herein.

Sections 8 and 9 indicate that the district envisioned a different set of academic offerings at the Vesta school than at the public school in Wabasso. These sections

_____

[8]The majority finds "little significance" in the fact that the Brethren were party to the lease, but the group's inclusion is significant in light of the district's claim that it did not take into account the religious background or beliefs of those who requested exemptions from the standard curricula.

reserve to the district the right to provide special education, health, music, physical education classes, and hot lunches at the Wabasso elementary school for any students at Vesta who might want to participate in these normally available programs which would not be offered at Vesta because of the preferences of the Brethren.

The Brethren were actively involved in other ways in the reopening of the Vesta school. Lloyd Paskewitz and several other members of the Brethren participated in the interviews conducted to select a teacher for the new school. It is undisputed that it was unprecedented to have non-district employees present at such interviews. On June 1, 1993, Lloyd Paskewitz provided Superintendent Bates with a list of 19 children who planned to attend the school in Vesta, and only these children eventually enrolled in the school.

There are significant differences between the curricula offered at Vesta and Wabasso. Although the official curricula adopted for the Vesta school calls for at least one half hour of computer lab each week and district officials claim computer technology is available at Vesta, computer training has never been offered. Other forms of technology to which the Brethren object, such as television, video players, and films, have not been used at Vesta, although they are regularly used at Wabasso. The health offerings at Vesta are also not the same as those offered at Wabasso. The drug awareness education programs used in the Wabasso school for kindergarten through sixth grade are not available at Vesta. Although the official curricula at Vesta requires one half hour of physical education each day "with specialists," it is presented in an unstructured manner by a parent volunteer who has no formal training in physical education. At Wabasso it is taught in a structured manner by a physical education teacher. The Vesta curricula officially requires at least an hour of musical instruction each week, but the record does not indicate that music is actually offered. If a child at the Vesta school wants such standard curricula offerings, he or she must make a special request and then commute thirty miles in the middle of the school day to Wabasso for health, physical education, or music classes.

The facts of this case show an abandonment of the principle of state neutrality in religious matters which underlies establishment clause jurisprudence. See Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 114 S. Ct. 2481, 2487 (1994). The first amendment prohibits the state from favoring one religion over another or from favoring religious adherents collectively over non-adherents. Id. (citing Epperson v. Arkansas, 393 U.S. 97, 104 (1968)). Religious neutrality is particularly important in the context of elementary and secondary schools, where the students are impressionable and attendance is involuntary. Edwards v. Aguillard, 482 U.S. 578, 583-84 (1987). While the Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause," Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter Day Saints v. Amos, 483 U.S. 327, 334 (1987) (citations and quotations omitted), "accommodation is not a principle without limits," and at some point accommodation may devolve into an unlawful fostering of religion. Kiryas Joel, 114 S. Ct. at 2492; Amos, 483 U.S. at 334. An asserted motivation of religious accommodation, even if justified by reference to a state statute, cannot shield governmental actions that otherwise violate the principle of neutrality embedded in the establishment clause. See Kiryas Joel, 114 S. Ct. at 2493.[9]

Here the school district has done far more than grant individual exemptions to aspects of the public school curricula under state law, for it has entered into a contractual relationship with members of a religious group to tailor a school to their preferences. The district has agreed to limit the use of technology not for pedagogical reasons, but to match the tenets of a single religious group. It also modified the health, music, physical education, and computer curricula normally offered. The district has acted to create a school where a student interested in participating in the standard

---

[9]The district's decision to reopen the school by entering into a special written agreement with a religious group could not have been motivated by statutory duties because the district approved the proposal from the Brethren to reopen the school in February 1993 and Minn. Stat. § 126.699 (1996) was not passed until May 1993.

health, physical education, music, or computer offerings must make a special request and/or commute almost thirty miles during the school day to obtain such regular educational services at Wabasso. It is not surprising that non-Brethren children have not enrolled at Vesta.

This case is similar to Kiryas Joel where the Supreme Court found that the creation of a school district based on the religious affiliation of the community members was unconstitutional because it impermissibly singled out a particular religious group for special treatment. 114 S. Ct. at 2491. The village of Kiryas Joel had been established as an enclave for a particular sect of Hasidic Jews called the Satmars who, like the Brethren, eschewed much of the modern world and maintained a very isolated community. The Satmar children were normally educated in private religious schools in the village, but these parochial schools did not provide services for handicapped students as required by state law. The New York legislature created a special school district that conformed to the boundaries of the village so that services for handicapped children could be provided in a way acceptable to the Satmars. Since the community of Kiryas Joel did not receive its benefit "simply as one of many communities eligible for equal treatment under a general law," there was no guarantee that the next religious community desiring its own school district would be given one and the arrangement was unconstitutional. Id.

Like the legislature in Kiryas Joel, the school district has singled out a particular religious group for benefits by setting up a school the Brethren find acceptable in order to retain their participation in the public school system. There is no guarantee that the next religious group in the district (or elsewhere in the state) could obtain a special school for its members supported with a publicly funded teacher teaching a modified curricula in accordance with their religious beliefs. The establishment of the school in Vesta thus violates the principle of neutrality and "crosses the line from permissible accommodation to impermissible establishment." Id.

The district argues it reopened the Vesta school to provide a better public education by transporting fewer students from Vesta to Wabasso, reducing the class size in Wabasso, and by lessening a space shortage there as well, but these purposes could have been carried out by reopening the Vesta school as it had operated before without a special signed agreement with the Brethren. The only reason the Brethren are involved is that the district presumably could not afford to reopen the Vesta school without the financial assistance they provided directly in the agreement and indirectly by enrolling their children in the public school system. Even if the district was motivated by improving the overall quality of education in its area, it established a school in which the curricula conformed to the religious objections of the Brethren in exchange for financial assistance. This is not an acceptable secular purpose. See Epperson, 393 U.S. at 106 ("There is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma."); Edwards, 482 U.S. at 593 (striking down Louisiana's Creationism act because the "purpose of the . . . Act was to restructure the science curriculum to conform with a particular religious viewpoint"); Pratt v. Independent Sch. Dist. No. 831, 670 F.2d 771 (8th Cir. 1982) (removing a film from a school curriculum based on religious objections violated the Establishment Clause).

An impermissible effect of governmental action is one that endorses or promotes religion. County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 592-601 (1989); Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 17 (1989). Whether the primary effect is the impermissible endorsement of religion can be measured by what reasonable observers, including non-adherents, would conclude. Allegheny, 492 U.S. at 595, 627-32 (plurality opinion). As the district court pointed out, the way in which the school was reopened and operated created a perception in the community that the school was really just for the children of the Brethren even though it was theoretically open to all students. The effect of establishing the school was thus an endorsement of the Brethren's beliefs.

The majority relies on <u>Clayton by Clayton v. Place</u>, 884 F.2d 376 (8th Cir. 1989), for the idea that state action which coincidentally mirrors certain religious beliefs does not have the effect of promoting religion. <u>Clayton</u> upheld a rule prohibiting dances at public schools where there was no evidence in the record to indicate why the rule had been passed. <u>Id.</u> at 378, 380. In contrast, the actions of the district regarding the school in Vesta did not simply coincide with the beliefs of the Brethren. The record reflects direct involvement of the Brethren in organizing and financing the school. Mr. Paskewitz's letter, the meetings of the school board, and the formal written agreement between the district and the Brethren, all indicate that but for the religious concerns and financial support of the Brethren, the school in Vesta would never have been reopened or operated in the current manner. Here there is far more than mere coincidence between the modifications of the Vesta school program and the beliefs of the Brethren.

The district contends the Vesta school does not advance religion because it is open to all students and the same curricula available at Wabasso is available to Vesta students willing to bus to Wabasso for specific classes, but it is appropriate to look beyond the theory to examine the practical reality of the situation. <u>See</u> <u>Kiryas Joel</u>, 114 S. Ct. at 2488-89 (looking at effect of statute, not its form); <u>Lee v. Weisman</u>, 505 U.S. 577, 593, 595 (1992) ("subtle and indirect" pressure to participate in religious ceremony can be as real as overt compulsion; "law reaches past formalism"); <u>Edwards</u>, 482 U.S. at 586-87 ("While the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham."). The contemporaneous newspaper accounts indicate the Vesta school is considered by both Brethren and non-Brethren citizens to be a school for the Brethren children. The Vesta school creates the perception that the state has singled out the Brethren for special, preferential treatment by modifying the standard curricula to fit their religious objections. Such treatment has the primary effect of creating a state endorsement of the religious views of the Brethren, <u>Edwards</u>, 482 U.S. at 593 ("preference" for particular religious beliefs constitutes an endorsement of religion), and cannot be reconciled with the establishment clause cases which require the

-26-

government to adopt a neutral position toward religion. See, e.g., Kiryas Joel, 114 S. Ct. at 2487; Wallace v. Jaffee, 472 U.S. 38, 52-54; Epperson, 393 U.S. at 104.

Three primary criteria are helpful in considering whether state action has the effect of advancing religion: whether it results in government indoctrination of religious beliefs, whether it defines the aid recipients by reference to religion, and whether it creates an excessive entanglement between the state and religion. Agostini v. Felton, Nos. 96-552, 96-553, 1997 WL 338583 (U.S. June 23, 1997) at *21. Applying these factors to the facts of this case, the actions of the district have the impermissible effect of advancing religion.

Aid that furthers the educational function of religious schools is no longer presumed to be invalid per se, Agostini, 1997 WL 338583, at *15, but state action may impermissibly indoctrinate religious beliefs when it provides direct aid to religious institutions or when it relieves sectarian institutions of costs they otherwise would bear. Id. at *17; see also Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 12 (1993). Although the Vesta school is theoretically open to the public, the district's actions are suspect because they relieve the Brethren of costs they would have otherwise borne in homeschooling or establishing their own school. If this arrangement were upheld, it would no longer be necessary for Catholic, Lutheran, Jewish, or Muslim communities to expend the resources required to establish separate parochial schools. They could also offer a district free rent in a building they own in exchange for a teacher and teaching materials and obtain a religiously homogeneous school with basic educational instruction to their liking. This is the type of direct subsidization that has the effect of advancing religion. Agostini, 1997 WL 338583, at *17; Meek v. Pittenger, 421 U.S. 349, 365-66 (1975) (lending instructional materials and equipment to sectarian schools has the effect of advancing religion).

Aid provided to all eligible children on the basis of neutral, secular criteria regardless of where they attend school is permissible because it does not define

recipients on the basis of religion and does not provide incentives for recipients to modify there religious beliefs.  <u>Agostini</u>, 1997 WL 338583, at *18-19; <u>see also</u> <u>Widmar v. Vincent</u>, 454 U.S. 263, 274 (1981) .  In contrast, the effect of the Vesta operation is to provide a benefit for the Brethren which it does not provide for non-Brethren. The Brethren children can now obtain a publicly financed education in Vesta that conforms with their particular religious beliefs, while non-Brethren children, either with or without the reopened Vesta school, must still commute to Wabasso if they want to receive all of the curricula regularly offered by the district. The actions of the district violate the establishment clause because they have the effect of singling out the Brethren for a special benefit.

State aid or action will also advance religion if it leads to an excessive entanglement between church and state.[10]  The test for an impermissible entanglement examines the character and purposes of the institutions benefitted, the nature of the aid provided, and the resulting relationship between the government and the religious authority.  <u>Agostini</u>, 1997 WL 338583, at *19 (quoting <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 615 (1971)).  Here, the district has entered into a contractual relationship with a religious group for mutual benefit, essentially forming a partnership between the Brethren and the district to open and operate the Vesta school with a curricula acceptable to the religious group.

There are many competing values in our richly diverse society, and the religion clauses of the first amendment protect the rights of all to practice the religion of their choice and also prevent the government from preferential advancement of any one religious group.  Because the school district's establishment of the special school at Vesta crosses over the line permitted under the Constitution, I dissent.

---

[10]<u>Agostini</u> states that previous cases have essentially collapsed the "effect" and "entanglement" prongs of the <u>Lemon</u> test.  <u>Id.</u> at *19.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.