The Honorable Paul Bookout State Representative 2104 Catharine Drive Jonesboro, AR 72404-6963
Dear Representative Bookout:
I am writing in response to your request for my opinion on the following question, which you report having submitted on behalf of Craighead County Judge Dale Haas:
 Pursuant to A.C.A. § 14-137-101 [et seq.], can a private school utilize a "public facilities board" to sell bonds?
RESPONSE
With respect to any particular institution, only a court could finally answer this question based upon a review of all the attendant facts. However, assuming the revenue bond proceeds were devoted to effecting capital improvements at a private educational facility, I believe the relevant law might support this means of financing. In explanation of the fact that this conclusion is tentative, I should note that the relevant Arkansas case law deals only with the financing of a private institution of higher education. There is some question whether the same standard applies to institutions of primary and secondary education. Moreover, if the school were a sectarian or parochial institution, I believe the establishment clause would dictate that the public facilities board avoid any conduct or earmarking of bond revenues that would amount to the sponsorship of religious indoctrination. Finally, as most recently acknowledged in Steele v. Industrial Development Board of MetropolitanGovernment of Nashville, 2002 FED App. 0274P (6th Cir., August 14, 2002), the law is unclear as to whether a bond issue of the sort proposed would be permissible if the private school could be characterized as "pervasively sectarian."
Chapter 137 of title 14 of the Arkansas Code (Repl. 1998 Supp. 2001) comprises the Public Facilities Board Act (the "Act"). Subsection14-137-102 declares, inter alia, that "educational facilities . . . are essential to the physical and mental health, safety, and physical and economic welfare of the people of this state" and authorizes public financing of such facilities through the issuance of revenue bonds by public facilities boards, which A.C.A. § 14-137-111(a)(1) expressly characterizes as bodies corporate and politic. Subsections14-137-106(a)(1) and -107(a) authorize any municipality or county to create a public facilities board by ordinance of the governing body. Section 14-137-105 provides: "This chapter, being necessary for the welfare of the state and its inhabitants, shall be liberally construed to effect the purposes of it." Subsection 14-137-103(22) defines the term "educational facilities" in pertinent part as follows:
 "Educational facilities" means real, personal, and mixed property of any and every kind intended for use by an educational institution in furtherance of its educational program. . . .
Neither this statute nor any other provision of the Act restricts the financing of educational facilities to public, as opposed to private, institutions.[1]
In Cortez v. Independence County, 287 Ark. 279, 698 S.W.2d 291 (1985), the Arkansas Supreme Court entertained a taxpayer's challenge to the issuance of educational facilities bonds by the Independence County Public Health and Education Facilities Board to finance capital improvements at Arkansas College in Batesville, a private institution affiliated with the Presbyterian Church. Id. at 281-82. Specifically, the court addressed the following issues:
 (1) whether the bonds lend the credit of Independence County in violation of Ark. Const. Art. 12, 5 and art. 16, 1; (2) whether the bonds have a valid public purpose as described in Murphy v. Epes, 283 Ark. 517, 678 S.W.2d 352 (1984); and (3) whether the bonds constitute impermissible state aid to religion in view of Arkansas College's ties with the Presbyterian Church.
Id. The court affirmed the trial court's decision in favor of the Board on each of these questions. Id. at 282.
The court summarily rejected the first of these challenges, noting that, by statutory requirement, each revenue bond obligates only the public facilities board, not the county. Id. This qualification is currently set forth at A.C.A. § 14-137-230(a), which provides:
 It shall be plainly stated on the face of each bond that it has been issued under the provisions of this chapter, that the bonds are obligations only of the public facilities board, and that in no event shall they constitute an indebtedness for which the faith and credit of the creating municipality or county or any of its revenues are pledged.
The issuance of such revenue bonds is expressly authorized by Ark. Const. amend. 65. Under Arkansas law, then, any issuance by a county public facilities board of revenue bonds to support a private school would not constitute an impermissible pledge of the county's credit.
The court in Cortez likewise held that issuing public facilities bonds to benefit a private school would clearly serve a valid public purpose. After noting that the above recited definition of "educational facilities" is broad enough to embrace private institutions, the court remarked" that education, in general, is a legitimate public purpose."Id. at 282-83, citing Turner, supra. Moreover, as noted in the Publisher's Notes to A.C.A. § 14-137-111, in Act 47, § 5 of 1987, the legislature expressly declared that the issuance of revenue bonds to finance a public facilities project serves a public purpose as envisioned in Ark. Const. amend. 65, which authorizes the issuance of revenue bonds for such "public purposes as may be authorized by the General Assembly." As acknowledged in Cortez, then, the legislature has recognized that the promotion of all education, whether private or public, serves a public purpose. Accordingly, in my opinion, the law discussed above would not preclude a private school from receiving the proceeds of public facilities bonds.
However, assuming the private school at issue is sectarian, the question remains whether financing its operations through the issuance of public facilities bonds might offend U.S. Const. amend. 1 and Ark. Const. art. 2, §§ 24 and 25, which are generally coextensive in prohibiting any government establishment of religion. See, e.g., Abram v. City ofFayetteville, 281 Ark. 63, 661 S.W.2d 371 (1983); Cude v. State,237 Ark. 927, 377 S.W.2d 816 (1964); Lendall v. Cook, 432 F. Supp. 971, 976
(E.D.Ark. 1977); Cortez, supra; Ark. Op. Att'y Gen. No. 2001-163. In Ark. Op. Att'y Gen. No. 2001-256, I offered the following regarding the level of scrutiny that applies in addressing a challenge based on the establishment clause:
 As the Eighth Circuit Court of Appeals noted in Children's Healthcare v. Min de Parle, 212 F.3d 1084, 1090 (8th Cir. 2000), an Establishment Clause analysis necessarily begins with a determination of the standard under which the government action will be reviewed:
 [W]e initially must determine whether [the government action] discriminates among religious sects. If so, we apply strict scrutiny review under Larson v. Valente, 456 U.S. 228 (1982). If not, we administer the three-part test set forth by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971). See Hernandez v. Commissioner, 490 U.S. 680, 695 (1989) (applying the Lemon test where no facial sect preference exists).
(Footnote omitted.)
Under a strict-scrutiny analysis, in order to avoid offending the establishment clause, the public facilities board would need to establish that its action was closely fitted to a compelling governmental interest. Larson, 456 U.S. at 246-47; Hernandez, 490 U.S. at 695. Under the alternative Lemon analysis, the board would need to establish that its issuance of the bonds would (1) have a secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) not foster an excessive entanglement with religion. 403 U.S. at 612-13. InAgostini v. Felton, 521 U.S. 203, 232-33 (1997), the Court in effect conflated the final two elements in the Lemon analysis into a single prong based on the reasoning that "excessive entanglement" was in itself an element in determining whether a government action had the "primary effect" of advancing or inhibiting religion. The Court then held that government action cannot be deemed to result in the impermissible effect of promoting religion if it meets three criteria: "it does not result in governmental indoctrination; define its recipients by reference to religion; or create an excessive entanglement." Id. at 234; accordMitchell v. Helms, 530 U.S. 793, 807-08 (2000).
In my opinion, a reviewing court would not conduct a strict-scrutiny analysis of bonds issued under the Act, which in no way discriminates among religious sects. The Act merely establishes a facially neutral procedure whereby a public facilities board may issue bonds to finance improvements in "educational facilities," regardless of whether these facilities have some religious affiliation. However, notwithstanding the fact that the statute is facially constitutional, the question remains whether it has been constitutionally implemented in any particular case — an inquiry that involves applying the Lemon/Agostini test.
With respect to the first element of this test, the court in Children'sHealthcare observed:
 The requirement that the law reflect a valid secular purpose" aims at preventing the relevant governmental decision maker . . . from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." In re Young, 141 F.3d 854, 862 (8th Cir. 1998), cert. denied, 119 S.Ct. 43 (1998) (quoting Corp. of the Presiding Bishop v. Amos, 483 U.S. 327, 335
(1987)).
212 F.3d at 1093. In Stark v. Independent School District No. 640,123 F.3d 1068, 1076 (1997), the Eighth Circuit Court of Appeals summarized as follows the requirement of government neutrality:
 The extension of a benefit through the neutral application of state law . . . does not violate the Establishment Clause. The Supreme Court has said:
 A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion. . . . We have held that the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse.
 Rosenberger v. Rector and Visitors of the Univ. of Virginia, 515 U.S. 819, ___, 115 S.Ct. 2510, 2521, 132 L.Ed.2d 700 (1995); see also Agostini, 521 U.S. at ___, 117 S.Ct. at 2014. ("[W]here the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to religious and secular beneficiaries on a nondiscriminatory basis . . . the aid is less likely to have the effect of advancing religion.").
The question of whether a public facilities board uses its bond-issuing authority to favor or disfavor religious institutions is ultimately one of fact beyond my capacity and authority to address. I can and will opine that the Act on its face is scrupulously neutral in authorizing the issuance of bonds to support "educational facilities" as defined at A.C.A. § 14-137-103(22). The mere fact that private sectarian schools, among others, might fall within this neutral category of "educational facilities" does not render the legislation itself unconstitutional. SeeZelman v. Simmons-Harris, ___ U.S. ___, 122 S.Ct. 2460 (2002) (approving school voucher program that was neutral in all respects regarding religion, notwithstanding the fact that 82% of participating private schools had a religious affiliation); compare Board of Education ofKiryas Joel Village School District v. Grumet, 512 U.S. 687, 693, 703
(1994) (declaring unconstitutional a statute creating an exclusively ultra-Orthodox Jewish school district "[b]ecause the religious community of Kiryas Joel did not receive its new governmental authority simply as one of many communities eligible for equal treatment under a general law"). However, assuming the public facilities board in this instance were to issue bonds on behalf of a parochial school, only a trier of fact, based upon the entire record before it, possibly including any history of similar bond issues that benefited secular institutions, could determine whether the board's action was indeed based on "neutral, secular criteria." Given the factual nature of this inquiry, I am unable to opine whether any particular issuance of bonds in support of a parochial school would be permissible.
With respect to the "primary effect" prong of the Lemon/Agostini test, Justice Thomas, writing on behalf of a plurality of the Court in Mitchellv. Helms, 530 U.S. 793, 808 (2000), offered the following analysis:
 As we indicated in Agostini, and have indicated elsewhere, the question whether governmental aid to religious schools results in governmental indoctrination is ultimately a question whether any religious indoctrination that occurs in those schools could reasonably be attributed to governmental action. See Agostini, supra, at 226 (presence of sign-language interpreter in Catholic school "`cannot be attributed to state decisionmaking'" (quoting Zobrest, 509 U.S., at 10) (emphasis added in Agostini)); 521 U.S., at 230 (question is whether "any use of [governmental] aid to indoctrinate religion could be attributed to the State"); see also Rosenberger, 515 U.S., at 841-842; Witters v. Washington Dept. of Servs. for Blind, 474 U.S. 481, 488-489
(1986); Mueller v. Allen, 463 U.S. 388, 397 (1983); cf. Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 337 (1987) ("For a law to have forbidden `effects' under Lemon, it must be fair to say that the government itself has advanced religion through its own activities and influence"). We have also indicated that the answer to the question of indoctrination will resolve the question whether a program of educational aid "subsidizes" religion, as our religion cases use that term. See Agostini, 521 U.S., at 230-231; see also id., at 230.
530 U.S. at 809.
Specifically addressing the relationship between the concepts of neutrality and indoctrination, Justice Thomas further observed:
 In distinguishing between indoctrination that is attributable to the State and indoctrination that is not, we have consistently turned to the principle of neutrality, upholding aid that is offered to a broad range of groups or persons without regard to their religion. If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government. For attribution of indoctrination is a relative question. If the government is offering assistance to recipients who provide, so to speak, a broad range of indoctrination, the government itself is not thought responsible for any particular indoctrination. To put the point differently, if the government, seeking to further some legitimate secular purpose, offers aid on the same terms, without regard to religion, to all who adequately further that purpose, see Allen, 392 U.S., at 245-247 (discussing dual secular and religious purposes of religious schools), then it is fair to say that any aid going to a religious recipient only has the effect of furthering that secular purpose. The government, in crafting such an aid program, has had to conclude that a given level of aid is necessary to further that purpose among secular recipients and has provided no more than that same level to religious recipients.
530 U.S. at 809-10.[2]
As previously noted, the legislature has seen fit in the Act to characterize as a legitimate public purpose revenue-bond financing of capital improvements at all educational facilities, apparently regardless of whether the institutions affected are private or public, sectarian or secular. Under the standard just recited, this legislation in itself in no way offends either the state or the federal constitution.
However, some doubt remains whether the passage just quoted accurately states the law. As noted above, Justice Thomas in Mitchell was writing only on behalf of a three-member plurality. The Sixth Circuit Court of Appeals stressed the significance of this fact in the very recent case ofSteele v. Industrial Development Board of Metropolitan Government ofNashville, 2002 FED App. 0274P (6th Cir., August 14, 2002), in which the court reversed a district court's ruling that the establishment clause prohibited the issuance of industrial development revenue bonds for the benefit of a "pervasively sectarian" college. The court noted that some Supreme Court precedents had held that state aid to "pervasively sectarian" institutions would necessarily offend the establishment clause, regardless of any other factors such as the state's use of neutral criteria in the dispensation of aid. The appellate court's analysis of this issue is worth excerpting at some length:
 The district court concluded that Lipscomb University is a pervasively sectarian institution. The district court set forth the law governing this analysis as follows:
 The pervasively sectarian test is based on the line of cases beginning with Tilton,[3] and extending through Bowen v. Kendrick, 487 U.S. 589
(1988). In Hunt v. McNair, [413 U.S. 734 (1973)], the Court found that aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting." 413 U.S. 734, 743 (1973). Thus, the rule under the pervasively sectarian test, as stated in Roemer v. Board of Publ. Works of Maryland, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976), is that" no state aid at all go to institutions that are so `pervasively sectarian' that secular activities cannot be separated from sectarian ones. . . ." 426 U.S. at 755.
* * *
 The vitality of the pervasively sectarian test is questionable in light of subsequent, more recent decisions from the Supreme Court. In Mitchell v. Helms, 530 U.S. 793 (2000), six of nine Justices rejected an Establishment Clause challenge to loans of educational materials directly to parochial schools. Justice Souter pointed out in his dissenting opinion that "[N]o one, indeed, disputes . . . that the Roman Catholic schools which made up the majority of the private schools participating, were pervasively sectarian. . . ." In his plurality opinion, Justice Thomas responded by stating that:
 [T]he dissent is correct that there was a period of time when this factor mattered, particularly if the pervasively sectarian school was a primary or secondary school.[4] But that period is one that the Court should regret, and it is thankfully long past."
 Id. at 826. Justice Thomas went on to note that the pervasively sectarian analysis, "born of bigotry, should be buried now." Id. at 829.
 Yet Mitchell is a plurality opinion. Thus, the district court, and this Court, are still bound by pre-Mitchell law with regard to the pervasively sectarian doctrine. As the district court correctly noted:
 It is well settled that in a plurality opinion, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Coe v. Bell, 161 F.3d 320, 354 (6th Cir. 1998) (quoting Marks v. United States, 430 U.S. 188, 193 (1977)). . . . In Mitchell, there is no single part of any opinion that commands the support of a majority of the Court. As a result, the only binding precedent of Mitchell is the holding. See Igor Kirkman, Note, Standing Apart to be A Part: The Precedential Value of Supreme Court Concurring Opinions, 95 Colum. L. Rev. 2083, 2084-85 (1995); Ken Kimura, A Legitimacy Model for the Interpretation of Plurality Decisions, Cornell L. Rev. [1]593, 1596-98 (1992).
 Steele,[5] 117 F. Supp. 2d at 706 (parallel citations omitted).
 Further, the Supreme Court has specifically stated that the lower courts are to treat its prior cases as controlling until the Supreme Court itself specifically overrules them. Agostini v. Felton, 521 U.S. 203, 237 (1997). In reaffirming its prior mandate the Court noted in Agostini that "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to the Court the prerogative of overruling its own decisions." Id. citing Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989). It is for the Supreme Court, not this Court, to jettison the pervasively sectarian test, which it has not done.
2002 FED App. 0274P, at 6-7.
I consider the court's summary of the law regarding precedential effect to be fundamentally sound, and I agree that it suggests that a court might be compelled to strike down as unconstitutional any direct or indirect governmental assistance to any entity it finds to be "pervasively sectarian." However, the Sixth Circuit court, having acknowledged that the "pervasively sectarian" standard has not been overruled by the Supreme Court, nevertheless proceeded to undertake an analysis that seems to have accepted but ignored the district court's finding that "the central mission of the school is to inculcate and promote Churches of Christ doctrine as the true word of God." Id. at 6. Rather than discussing the constitutional implications of this characterization, the court simply followed the approach suggested by the Supreme Court in the case law discussed above, focusing on such questions as whether the bond financing was indeed offered using neutral criteria that did not reflect any sectarian motivation and whether the state would incur any liability in the event of a default on the bonds. The court summarized its analysis as follows:
 Because the proposed issuance of industrial revenue bonds to Lipscomb University is part of a neutral program to benefit education, including that provided by sectarian institutions, and confers at best only an indirect [tax] benefit to the school, we hold that the issuance of the bonds does not violate the First Amendment.
 In sum, the nature of the institution is not the relevant inquiry in the special type of aid at issue in this appeal. The nature of the aid conferred by the tax free revenue bonds is not direct aid. Instead, it is analogous to an indirect financial benefit conferred by a religiously neutral tax or charitable deduction and is indistinguishable from that expressly approved in Walz, supra.[6] The funding vehicle is available on a neutral basis. No government funds will be expended. Nor does any holder of a bond have recourse against the Board or Metro in the event of non-payment. The benefit to be obtained by Lipscomb University is the same provided to private companies which create identical economic opportunities. The conduit financing advances a clear governmental, secular interest in promoting economic opportunity. Finally, the revenue bond program does not present the perception of government endorsement of religion.
2002 FED App. 0274P, at 13.
In an expansive dissent, Circuit Judge Clay defined the issue on appeal as being "whether the low-interest loan by the Board to Lipscomb funded through the issuance of the tax-exempt bonds violates the Establishment Clause because Lipscomb is a pervasively sectarian institution and the loan amounts to direct state aid." Id. at 21. In Judge Clay's estimation:
 The low-interest loan of $15 million originated by the Board at Lipscomb's request constituted a direct economic benefit because it enabled Lipscomb to advance its sectarian mission by funding improvements to the University. Given its pervasively sectarian character, the direct economic benefit to Lipscomb results in excessive governmental entanglement with the religious mission of the University in violation of the Establishment Clause.
Id. at 14.
In light of the foregoing, I believe at least one question appears to be ripe for clarification by the U.S Supreme Court: Does a grant of state aid to a pervasively sectarian entity — regardless of whether the aid be direct or indirect and regardless of whether it be exclusive or administered in the course of a broader, "neutral" program of assistance — offend the establishment clause of the U.S. Constitution?[7] Pending an answer to this question, I am unable to opine whether the bond issue referenced in your request would be permissible with respect to a pervasively sectarian institution. However, I believe such financing might be permissible with respect to a private school that is secular or whose parochial characteristics are not" pervasive." Legislative or judicial clarification on this issue appears warranted.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
[1] I should note that the legislature in 1999 passed S.B. 547, which dealt with the bond-issuing authority of the Arkansas Development Finance Authority. If enacted, the bill would have added to the Code as A.C.A. §15-5-306(b) the following provision:
 Bonds shall not be exempt from state, county and municipal taxes if the bonds are issued for the purpose of financing educational facilities that constitute a private school, kindergarten through the twelfth grade, which seeks to serve the same student population base within a community as is offered to be served by the public schools of the same community.
Governor Huckabee vetoed this legislation on April 6, 1999. It did not become law.
[2] For a highly informative history of the complex and variable ways the term "neutral" has been applied in Supreme Court jurisprudence, see Section II(A) of Justice Souter's dissent in Mitchell.
[3] Tilton v. Richardson, 403 U.S. 672 (1971).
[4] In his dissent, Justice Souter summarized as follows the Supreme Court's enhanced attention to establishment clause concerns at the levels of primary and secondary education:
 [W]e have expressed special concern about aid to primary and secondary religious schools. Tilton, 403 U.S., at 685-686. On the one hand, we have understood how the youth of the students in such schools makes them highly susceptible to religious indoctrination. Lemon, supra, at 616 ("This process of inculcating religious doctrine is, of course, enhanced by the impressionable age of the pupils, in primary schools particularly"). On the other, we have recognized that the religious element in the education offered in most sectarian primary and secondary schools is far more intertwined with the secular than in university teaching, where the natural and academic skepticism of most older students may separate the two, see Tilton, supra, at 686-689; Roemer, 426 U.S., at 750. Thus, government benefits accruing to these pervasively religious primary and secondary schools raise special dangers of diversion into support for the religious indoctrination of children and the involvement of government in religious training and practice.
530 U.S. at 887 (Souter, J., dissenting).
[5] Steele v. Industrial Development Board of the MetropolitanGovernment of Nashville and Davidson County, 117 F. Supp. 2d 693
(M.D. Tenn. 2000).
[6] In Walz v. Tax Commission, 397 U.S. 664 (1970, the Court held that a statute providing a tax exemption for realty owned by religious organizations did not offend the constitution.
[7] I am informed that plaintiffs' counsel in Steele has resolved to appeal the Sixth Circuit court's decision. Given the complexity of the issues, I would not be surprised to see the Supreme Court grant certiorari in order to clarify the applicable standard.